# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In Re:

**MARIE J. HOLGUIN,**

               **Debtor.**                             **No. 15-11410 J7**

**MARIE J. HOLGUIN,**

               **Plaintiff,**

**v.**                                           **Adv. No. 18-01042 j**

**NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-2, A DELAWARE STATUTORY
TRUST,**

               **Defendant.**

## RESPONSE TO SECOND AMENDED MOTION FOR SUMMARY JUDGMENT

Marie J. Holguin (hereinafter referred to as "Plaintiff" or "Debtor") by and through the undersigned counsel, files this Response[1] to National Collegiate Student Loan Trust 2006-2's (hereinafter referred to as "NCSLT") Second Amended Motion for Summary Judgment (docket #31) (hereinafter referred to as "MSJ") as follows:

## INTRODUCTION

The issue to be dealt with by the Court concerns the proper construction of 11 U.S.C. §523(a)(8)(A)(i). This section excludes from discharge a loan that is "made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution." The subsection essentially renders two types of educational debts nondischargeable: (1) any loan "touched" by a governmental unit; and (2) an educational loan made under any program funded by the government or a nonprofit institution.

---

[1] The response is timely due to the order entered by the Court on August 23, 2019 (docket #33) which allows Plaintiff until August 26, 2019 to file her response.

In its MSJ, NCSLT argues that the debt at issue here falls under the second type of educational debt and thus is nondischargeable. The second type of educational loan requires four elements for the loan discharge exception at issue: (1) an educational loan must be made; (2) under a program; (3) funded; (4) by a nonprofit institution.

## STATEMENT OF DISPUTED/UNDISPUTED MATERIAL FACTS

NCSLT relies on the affidavit from Bradley Luke, the Director of Operations for Transworld Systems, Inc. Debtor does not object that Mr. Luke may be used to authenticate the business records to which he alludes; however, Debtor objects to any assertion of fact made by Mr. Luke on the basis that he does not have any personal knowledge as to the transactions at issue, and thus these factual assertions would be inadmissible into evidence. Specifically, Plaintiff objects to Paragraph 36 of Mr. Luke's affidavit on the basis that it is conclusory. Mr. Luke states that after a diligent search he cannot find any records to support his statement that "TERI did indeed purchase loans from GMAC Bank Undergraduate Loan Program." Since the statement is conclusory and unsupported after a diligent search, Defendant requests the Paragraph be stricken. Further objections will be noted below.

Further, Defendant's exhibits were neither marked with exhibit letters, nor were the pages numbered which made the process of referring to supporting statements time consuming and difficult.

1.      Undisputed.

2.      Undisputed.

3.      Undisputed.

4.      Disputed. The document referenced as Exhibit B was entered into between The Education Resources Institute, Inc. (hereinafter referred to as "TERI") and GMAC Bank on

May 30, 2003 (alleged "Guaranty Agreement"). The document is offered for the purpose of establishing that TERI guaranteed the loan and loan program offered by GMAC for the loan at issue. The Guaranty Agreement is conditioned upon several factors. Exhibit B. Section 2.2.

Further,

… (redacted)

The Guaranty Agreement requires that the school the Debtor is attending be a "TERI-approved school." There is nothing in the record that establishes that New Mexico State University was a TERI-approved school. Exhibit B, Page 26.

Section 3.3(a) requires that at the time the loan was made for the Guaranty to be effective, GMAC was required to pay a "guaranty fee." There is no evidence that this fee was paid on this loan transaction. Exhibit B, Page 31.

Again, the Court can only infer that the initial term of the Guaranty Agreement was extended beyond the initial term, that New Mexico State University was a TERI-approved school, and that a guarantee fee was paid on this transaction. This requires the Court to jump to the conclusion that the loan was part of a program guaranteed by TERI or that the loan itself was guaranteed by TERI. For purposes of Summary Judgment, all reasonable inferences must be made in favor of the non-moving party. *Foster v. Johns-Manville Sales Corp.,* 787 F.2d 390, 391-92 (8th Cir. 1986).

5.    Undisputed.

6.    Undisputed.

7.    Undisputed.

8.    Undisputed. The document states this language.

9.    Undisputed.

10.     Undisputed.  The document states this language.

11.     Undisputed.  The document states this language.

12.     Undisputed.

13.     Plaintiff disputes as stated above in Paragraph 4 that TERI guaranteed this loan transaction and that the loan transaction was part of a loan program.  Plaintiff objects to the conclusory statement made by Mr. Luke in his affidavit (Paragraph 22) on the basis that he does not have personal knowledge of the assertion.  Plaintiff further disputes the statement on the basis that Exhibit B clearly states that the alleged guarantee is a conditional guarantee and not a guarantee of "any Program loan..."  Exhibit B, Section 3.3., Pages 6-7.

14.     Plaintiff disputes as stated above in Paragraph 4 that TERI guaranteed this loan transaction and the loan program funding this loan.  Plaintiff objects to the conclusory statement made by Mr. Luke in his affidavit (Paragraph 20) on the basis that he does not have personal knowledge of the assertion.

15.     Plaintiff disputes as stated above in Paragraph 4 that the Guarantee Agreement applies to this loan and any program under which this loan was made.  Plaintiff objects to the conclusory statement made by Mr. Luke in his affidavit (Paragraph 24) on the basis that he does not have personal knowledge of the assertion.

16.     Plaintiff disputes as stated above in Paragraph 4 that the Guarantee Agreement applies to this loan and any program under which this loan was made.  Plaintiff objects to the conclusory statement made by Mr. Luke in his affidavit (Paragraph 25) on the basis that he does not have personal knowledge of the assertion.

17.     Disputed.  Plaintiff objects to the conclusory statement made by Mr. Luke in his affidavit (Paragraph 27) on the basis that he does not have personal knowledge of the assertion.

Defendant relies on Ex. C, p. 89 in support of this fact. There is no page 89 to Exhibit C. Mr. Luke refers to Exhibit C, Page 6. Exhibit C is the 2006-2 Pool Supplement GMAC Bank document. In Article 1 of the document, it refers to an attached Schedule 1. Schedule 1 is supposed to identify all the loans that were to be a part of the "Transferred GMAC Bank Loans"; however, Schedule 1 is not attached to Exhibit C. Instead, the Defendant has generated a document and attached it to Exhibit C. The generated document is not referred to in Exhibit C. Plaintiff objects to Exhibit C on the basis that it is an altered document.

Further, in its Answers to Discovery Requests (Exhibit 1 attached), Defendant produced similar documents to those attached as exhibits to its MSJ. The glaring difference is that the generated document referred to above was not attached to the document identified as Exhibit C (Exhibit 1, Pages 9-13). Rather it was produced after the document referred to as Exhibit D (Exhibit 1, Page 15-28). This clearly shows that the generated document is just that – a document generated and meant to mislead the court into believing that the loan at issue was a loan securitized and transferred to the 2006-2 trust. Without the Schedule 1 that was supposed to be attached Schedule C, Defendant has failed to properly establish the chain of title proving its ownership on the loan at issue.

18.     Disputed. Mr. Luke refers to Exhibit C, Page 6. Exhibit C is the 2006-2 Pool Supplement GMAC Bank document. In Article 1 of the document, it refers to an attached Schedule 1. Schedule 1 is supposed to identify all the loans that were to be a part of the "Transferred GMAC Bank Loans"; however, Schedule 1 is not attached to Exhibit C. Instead, the Defendant has generated a document and attached it to Exhibit C. The generated document is not referred to in Exhibit C. Plaintiff objects to Exhibit C on the basis that it is an altered document.

19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30. These Paragraphs are Disputed on the same basis as mentioned in Paragraph 18 above. Without the Schedule 1 that was supposed to be attached Schedule C, Defendant has failed to properly establish the chain of title proving its ownership on the loan at issue.

31.     Disputed. Plaintiff's bank account was garnished on March 29, 2018 in the amount of $2,548.82. Complaint. Page 4, Paragraph 26 (docket #1).

32.     Undisputed.

33.     Plaintiff disputes as stated above that TERI guaranteed this loan transaction and that the loan transaction was part of a loan program.

34.     Plaintiff disputes as stated above that TERI guaranteed this loan transaction and that the loan transaction was part of a loan program.

## STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

Plaintiff requests that the Court take judicial notice of the following bankruptcy court proceedings and docket:

35.     The nonprofit company, The Education Resources Institute, Inc. (hereinafter referred to as "TERI"), which allegedly guaranteed loans originated and made by GMAC Bank, filed for Chapter 11 bankruptcy protection on April 7, 2008 in the United States Bankruptcy Court, District of Massachusetts, Case No. 08-12540 (Docket #1).

36.     Defendant was a creditor in the proceeding and was specifically classified as a secured creditor and provided for in TERI's Fourth Plan of Reorganization. Case 08-12540 (Docket #1104, Schedule B shows Defendant as a Class 3h creditor).

37.     In short, and among many other things, TERI's plan provided a settlement of all National Collegiate Trust claims which included the rejection of any Guaranty Agreements as of the Effective Date of the plan.  (Docket #1104, Page 40, Section 6.2(c)(x)).

38.     TERI's plan was confirmed on or about October 29, 2010 (Docket #1170).  While somewhat unclear, the Effective Date would have been November 14, 2010 (a date where no stay of the Confirmation Order is in effect).

39.     Plaintiff did not default on her loan until at least October 10, 2011 (Statement of Fact #31 (disputed on the basis that further payment was made towards the debt through garnishment in 2018).

40.     Plaintiff's default occurred at a time after TERI's plan was confirmed which rejected any further Guarantee Agreement – meaning Plaintiff's debt to GMAC was no longer guaranteed by TERI.

41.     Plaintiff filed her Chapter 7 bankruptcy on May 29, 2015.  Complaint, Page 2, Paragraph 7.)

42.     Plaintiff received her discharge on October 5, 2015.  Complaint, Page 2, Paragraph 11.  Case No. 15-11410, docket #14.

43.     On June 27, 2019, the Court specifically requested evidence showing that TERI paid out on any guarantee on any student loan made under the alleged GMAC Bank loan program.  Counsel for Defendant indicated that she could "get evidence" to that effect.

44.     Despite the request from the Court since June 27, 2019, the Defendant has failed to provide the Court with evidence showing that this loan and/or any other loans made by GMAC Bank under the loan program was ever funded by TERI.  The only evidence offered is a conclusory statement from a records custodian indicating that he has personal knowledge to

the effect but after a diligent search could not find any supporting documentation. Affidavit of Luke, Paragraph 36.

## LEGAL ARGUMENTS

A. **Material Facts in Dispute/Rule 56 standard not met.** Debtor submits, as outlined above, that there are still material facts that are in dispute. Material questions of fact remain in regard to 1) whether the Guaranty Agreement terminated pursuant to the termination terms of the Guaranty Agreement (Statement of Facts and Responses, Paragraph #4) prior to the time the loan in question was made to the Plaintiff; 2) whether Defendant is the actual holder/owner of the loan in question (Statement of Facts and Responses, Paragraphs 17-30); and whether TERI ever paid out on any of the loans made by GMAC Bank (Additional Statement of Facts, Paragraphs 43 and 44). The evidence presented requires the Court to make inferences. For purposes of Summary Judgment, all reasonable inferences must be made in favor of the non-moving party. *Foster v. Johns-Manville Sales Corp.,* 787 F.2d 390, 391-92 (8th Cir. 1986). Because Defendant has failed to meet the standard required pursuant to Rule 56, Debtor requests that the Motion be denied.

B. **Burden of Proof.** In a student loan dischargeability dispute, "the lender has the initial burden to establish the existence of the debt and that the debt is an educational loan within the statute's parameters[;] [t]he burden then shifts to the debtor, to prove [undue hardship]." *Roth v. Educ. Credit Mgt. Corp. (In re Roth)*, 490 B.R. 908, 916-917 (9th Cir. BAP 2013) (emphasis added, citations omitted). The Defendant has failed to meet its burden as established below.

C. **Even Assuming Defendant Meets its Burden on all of the Above, TERI did not Fund the Loan Program as required, nor did it ever pay or fund the guarantee.**

Upon parsing the language of §523(a)(8)(A)(i), the language indicates that it is sufficient for a governmental unit to guarantee an educational loan to render it non-dischargeable. However, it does **not** say it is sufficient for a non-profit to merely guarantee a loan. The language is clear in that Congress did not intend a mere nonprofit guarantee to be sufficient for nondischargeable purposes. The loan must have been made under a program funded in whole or part by a non-profit. This argument rests upon the commonly accepted canon of statutory analysis stating,

> [W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion. *Rodriguez v. U.S.,* 107 S.Ct. 1391, 1393, 480 U.S. 522, 525 (1987); *Wichita Crt. For Graduate Med. Educ. V. United States,* 917 F.3d 1221, 1226 (10th Cir. 2019).

The above interpretation is also consistent with the Congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally in favor of the debtor in order to provide the debtor with the comprehensive relief from the burden of his indebtedness. *Gullickson v. Brown,* 108 F.3d 1290 (10th Cir. 1997)(We are cognizant in our review of the requirement that the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor*); In re Olson,* 454 B.R. 466, 472 (Bankr.W.D.Mo. 2011). The principal has been applied to student loan exceptions to discharge. *In re Johnson,* 215 B.R. 750, 753 (Bankr.E.D.MO. 1997), aff'd, 218 B.R. 449 (8th Cir.BAP 1998) (applying, in the context of student loan debt, the well-established principal that exceptions to discharge are to be narrowly construed).

In *Golden v. JP Morgan Chase Bank,* 596 B.R. 239 (Bankr. E.D. N.Y. 2019), the Court provided an analysis on §523(A)(8)(a)(i). The *Golden* court denied the Defendant's motion to dismiss based on the standard that the pleaded facts must be accepted as true. However, just as

9

in this case, the Defendant in Golden primarily relied on the case of *In re O'Brien,* 419 F.3d 104 (2nd Cir. 2005) to support its position that the term "funded" should be read expansively to include a guaranty. The *Golden* court, however, distinguished *O'Brien* on the basis that "the Second Circuit's conclusion was based on the 'undisputed' and 'uncontested' fact, as noted by the district court, that the loan at issue was made by a program funded at least in part by TERI, and the loan at issue was exempt from discharge…." *Golden* at 266. Of course, in this case, this fact is hotly contested.

The *O'Brien* court found that since the loan program had been actually funded at least in part by TERI, that the loan was exempt from discharge. Another distinguishing characteristic was that in *O'Brien*, TERI paid on the its guarantee when the Debtor defaulted. In this case, TERI did not have anything to do with the actual funding of GMAC's loan program. In this case, it is only alleged that TERI guaranteed the loan program. No allegation has been made that TERI funded the GMAC loan program. No allegation has been made that TERI actually paid on its guarantee. In fact, TERI filed for bankruptcy relief before the Plaintiff defaulted and the guarantee agreement on this loan was deemed terminated. This case is distinguishable from *O'Brien* and other decisions following *O'Brien's* rationale on these two very factual differences.

In *Page v. JP Morgan Chase Bank (In re Page)*, 592 B.R. 334, 339 (8th Cir. BAP 2018), the BAP overruled the bankruptcy court's finding that TERI funded a loan because the court's "inference in NST's favor that TERI 'funded' the loan program was not reasonable as it was not supported by the evidence." The standard applied to determine whether TERI "funded" a loan as required by the statute required the court to determine whether TERI played any "meaningful part" in the procurement of the loans under the program. *Id.* at 337. The court

stated, "The cases applying the so-called 'meaningful part' test hinge on whether the non-profit entity committed financial resources to the loan program, or contributed something of value to make the program successful." In this case, other than an alleged agreement to guaranty loans, no evidence has been presented to the Court that TERI played any meaningful role in GMAC's loan program.

Defendant also argues that the Court may "look to the loan document itself" to find the loan nondischargeable. This argument has been struck down in *Golden* and other cited cases. The *Golden* court stated, "In addition, more is required to satisfy the requirements of Section 523(a)(8) than a statement in a loan document that 'either or both' of certain exceptions from discharge may apply. If that language alone were sufficient, then it hard to see what role would be left for Congress or the courts in drafting, interpreting,, and applying these sections of the Bankruptcy Code." *Golden* at 267*; See also, In re Clouser*, Memorandum Opinon, Case No. 11-33104, Page 5 (Bankr. Or. 2016)(Because there is no suggestion in the record that Debtor ever had personal knowledge of the existence or terms of a third-party guaranty, the boilerplate language of the Loan Documents cannot prove the actual existence of a guaranty); *Wiley v. Wells Fargo Bank, N.A. (In re Wiling),* 579 B.R. 1, 7 (Bankr.Me. 2017)(These preprinted portions of the Agreements do not mandate an inference that the Loans were, in fact, made under a program funded by a nonprofit institution).

Finally, there is something inherently wrong and disingenuous with Defendant's argument when it knows that the guaranty on this loan was terminated in TERI's bankruptcy. If the Court does find that TERI's participation was sufficient when the loan was made, it should apply 11 U.S.C. §105(a) to prevent Defendant's abuse of the process. At the time of the Plainitff's bankruptcy, there was no guaranty in place as it had been terminated in TERI's

bankruptcy. This change of circumstance should prohibit Defendant from now arguing that the loan guaranty prohibits Plaintiff from discharging the debt. Section 105(a) give the Court broad authority to prevent abuses of the bankruptcy process. *Marrama v. Citizens Bank of Massachusetts,* 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007).

## **CONCLUSION**

WHEREFORE, Plaintiff respectfully requests that this Court deny the Motion Summary Judgement and for any further relief deemed necessary by the Court.

*/s/ Electronically filed 5.31.19*
R. "Trey" Arvizu, III
Attorney for Plaintiff
PO Box 1479
Las Cruces, NM 88004
(575)527-8600
(575)527-1199 fax
trey@arvizulaw.com

## CERTIFICATE OF SERVICE

I CERTIFY that the foregoing was electronically filed with the Court via the CM/ECF system. All attorneys and parties identified with the Court for electronic service on the record in this case were served by electronic service in accordance with the CM/ECF system on this 31st day of May, 2019.

Electronically filed
R. "Trey" Arvizu, III

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW MEXICO

In Re:  Marie J. Holguin

Case No. 15-11410 J7

Chapter 7

Debtor,

Hon. Robert H. Jacobvitz

_____

Marie J. Holguin,

Adv. No. 18-01042-j

Plaintiff,

v.

National Collegiate Student Loan Trust 2006-2,
A Delaware Statutory Trust

Defendant.

## DEFENDANT'S OBJECTIONS AND RESPONSES TO HOLGUIN'S FIRST SET OF INTERROGATORIES

## INTERROGATORIES

Interrogatory No. 1:  Identify by name, address, telephone number, title and position, every individual who has provided information for, or otherwise assisted with answering, these interrogatories.

Answer:

Bradley Luke, Director of Operations for Transworld Systems Inc., subservicer for Defendant with assistance from counsel, Monette W. Cope, Attorney for NCSLT, 180 N. LaSalle St., Ste. 2400, Chicago, IL 60657, 312-782-9676

Interrogatory No. 2:  Identify each and every person who has personal knowledge of the events surrounding the Student Loan Agreement and any and all collection attempts.

Answer:

Defendant objects to this Interrogatory on the grounds that "events surrounding the Student Loan Agreement" is overly broad, not reasonably calculated to lead to the discovery of admissible evidence, and not reasonably limited in temporal scope.  Defendant objects to this Interrogatory to the extent that it purports to require the disclosure of information that is not within

Defendant's possession, custody, or control. Defendant objects to the request for "all collection attempts" as it is irrelevant to the matters raised in the complaint and is not likely to lead to admissible evidence.

Without waiving the objections, Bradley Luke, Director of Operations at Transworld Systems Inc., 2 Sun Court, Suite 215, Peachtree Corners, GA 30092. May be reached through Monette W. Cope at telephone number in response to No. 1.


      <u>Interrogatory No. 3 - Trial Witnesses:</u> Other than expert witnesses, identify by name, address, home and work telephone numbers, title and position, every person who NCSLT may call to testify as a witness on its behalf in this preceding and for each individual provide a summary of his or her anticipated testimony.

      <u>Answer:</u>

Objection to providing personal information about NCSLT's witnesses. Without waiving the objection, Bradley Luke, Director of Operations at Transworld Systems Inc., 2 Sun Court, Suite 215, Peachtree Corners, GA 30092. May be reached through Monette W. Cope at telephone number in response to No. 1.

Debtor, as upon cross-examination.
Any of Debtor's witnesses, as upon cross-examination.


Defendant reserves the right to supplement its response in accordance and compliance with the Federal Bankruptcy Rules, Federal Rules of Evidence, the Scheduling Order entered in this case, and any other applicable law or order.


      <u>Interrogatory No. 4 – Witnesses:</u> Other than expert witnesses, identify by name, address, telephone number, title and position, every person who NCSLT has not identified as a potential witness in the preceding interrogatory, but who may have knowledge relevant to the Student Loan Agreement. For each person identified provide a summary of the information which Debtor believes is known and relevant to the Student Loan Agreement.

      <u>Answer:</u>

      Defendant objects to this Interrogatory on the grounds that it is overly broad, not reasonably calculated to lead to the discovery of admissible evidence, and not reasonably limited in temporal scope. Defendant objects to this Interrogatory to the extent that it purports to require the disclosure of information that is not within Defendant's possession, custody, or control.

      NCSLT is without information as to what debtor believes is known and relevant to the Student Loan Agreement.

Interrogatory No. 5:  Identify the Rule 30(B)(6) designated representative of the NCSLT who will testify on its behalf regarding the Student Loan Agreement.

Answer:

Bradley Luke, Director of Operations at Transworld Systems, Inc., 2 Sun Court, Suite 215, Peachtree Corners, GA 30092.  May be reached through Monette W. Cope at telephone number in response to No. 1.

Interrogatory No. 6 - Exhibits:  List and provide each document which Debtor may offer into evidence, relevant to the Student Loan Agreement, and include for each document the title, date, author of the document, and identify all recipients of every responsive document.  For each document listed explain the reason the NCSLT asserts each such exhibit or document is relevant.

Answer:

Defendant objects to this Interrogatory to the extent that the "recipients" of documents are not within Defendant's knowledge, possession, custody, or control.

Subject to and without waiving the foregoing objection, Defendant refers to the initial disclosures and the documents produced contemporaneously with this response. Defendant will supplement its initial disclosures under Fed.R.Civ.P. 26(a)(1)(iii) when and to the extent required under Rule 26(e) and will make exhibit disclosures when required under Rule 26(a)(3)(A)(iii) or any applicable order.

Interrogatory No. 7 - Experts:  Identify each *expert* witness who NCSLT may call upon to testify in this contested proceeding, and for each expert describe:

    a)    The name, address and business/work telephone numbers;

    b)    That person's area of expertise and qualifications as they relate to issues herein;

    c)    The subject matter on which each person identified as an expert is expected to testify;

    d)    All opinions held by each person identified as an expert, and relevant to this proceeding;

    e)    The basis for all opinions held by each person identified as an expert, and relevant to this contested proceeding;

    f)    A list of all books, treaties, articles, publications, web sites or other written works which the person identified as an expert has either authored or co-authored; and

g)  A list of all books, treaties, articles, publications, web sites or other written sources which each person identified as an expert regards as authoritative on the subject matter for which the person will be testifying in this contested proceeding.


Answer:

At this time, NCSLT does not anticipate calling any expert witnesses, but will supplement this answer when and to the extent required under Rule 26(e) and will make exhibit disclosures when required under Rule 26(a)(3)(A)(iii) or any applicable pre-trial order.

Interrogatory No. 8:  Please provide an accounting of any and all funds received directly from the Plaintiff dating back to the inception of the loan.


Answer:

Defendant objects to this Interrogatory in that the phrase "all funds received directly from the Plaintiff" is unclear.

Without waiving the objection, see the Loan Financial Activity produced herewith.

Interrogatory No. 9:  Please identify all New Mexico cases in which NCSLT has collected proceeds on an alleged student loan following a bankruptcy discharge of the obligor.


Answer:

Defendant objects to this Interrogatory on the grounds that it is overly broad, not reasonably calculated to lead to the discovery of admissible evidence, and not reasonably limited in temporal scope.  Defendant objects to this Interrogatory to the extent that it purports to require the disclosure of information that is not within Defendant's possession, custody, or control. Defendant objects to the request as it is wholly irrelevant to the matters raised in the complaint and is not likely to lead to admissible evidence.


Interrogatory No. 10:  In the state court lawsuit against Plaintiff, Jonathan Boyd, Firm Relationship Analyst signed an affidavit on June 17, 2014 verifying the account.  Is all the information Mr. Boyd provided in his affidavit true and correct?  If not, please provide a detailed explanation as to what was incorrect and why it was incorrect.


Answer:

Defendant objects to the request as it is wholly irrelevant to the matters raised in the complaint and is not likely to lead to admissible evidence.

Interrogatory No. 11:  Was this account audited as required in relation to the Consent Order entered into between the Consumer Financial Protection Bureau and Transworld Systems, Inc. on September 18, 2017?  If so, please provide all documentation and support in relation to the audit.  If no, please state in detail the reasons this account was not audited as required.  (See Consent Order identified as Exhibit A – Pages 109-140 in Plaintiff's discovery responses).

Answer:

Defendant objects to the request as it is wholly irrelevant to the matters raised in the complaint and is not likely to lead to admissible evidence.  Defendant objects to this request because Debtor has no standing to investigate or enforce the Consent Order between Transworld Systems, Inc. and the CFPB. Defendant objects to this request because the state court law suit was not initiated within the Consent Order's applicable time period and so it is not subject to the Consent Order.

DATED  February 8, 2019

Respectfully Submitted,

ROSE L. BRAND & ASSOCIATES, P.C.

By /s/Andrew P. Yarrington
ANDREW YARRINGTON
Attorney for National Collegiate Student
Loan Trust 2006-2
7430 Washington Street, NE
Albuquerque, NM 87109
Telephone: (505) 833-3036
Andrew.Yarrington@roselbrand.com

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW MEXICO**

In Re:  Marie J. Holguin                                    Case No. 15-11410 J7

                                                           Chapter 7

                            Debtor,                        Hon. Robert H. Jacobvitz

_____

  Marie J. Holguin,

                                                           Adv. No. 18-01042-j

                            Plaintiff,

  v.

  National Collegiate Student Loan Trust 2006-2,
  A Delaware Statutory Trust

                            Defendant.

## DEFENDANT'S OBJECTIONS AND RESPONSES TO HOLGUIN'S REQUEST FOR PRODUCTION OF RECORDS

REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:  All documents that you may have

referred to in Answering the Interrogatories.

RESPONSE:

Defendant objects to producing the Consent Order between Transworld Systems Inc. and the
CFPB as this is already in the possession of the debtor.  Without waiving this objection, no other
documents.

REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2:  Produce all documents in your

possession relating to any and all business dealings between Plaintiff and NCSLT.

RESPONSE:

Defendant objects to the term "all" as used in this request as overly broad and unduly

burdensome. Defendant has made a good faith, reasonable, and diligent effort to locate responsive information. Defendant further objects to this request as the term "business dealings" is undefined. Without waiving the objection, see documents produced herewith.

REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:  All exhibits you intend to use at

trial.

RESPONSE:

Defendant refers to the initial disclosures and the documents produced contemporaneously with this response.  Defendant will supplement its initial disclosures under Fed.R.Civ.P. 26(a)(1)(iii) when and to the extent required under Rule 26(e) and will make exhibit disclosures when required under Rule 26(a)(3)(A)(iii) or any applicable order.

REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:  All copies of reports and

documents utilized by an expert which you propose to call at trial.

RESPONSE:

At this time, NCSLT does not anticipate calling any expert witnesses, but will supplement this answer when and to the extent required under Rule 26(e) and will make exhibit disclosures when required under Rule 26(a)(3)(A)(iii) or any applicable pre-trial order.

REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:  All documents in your possession

relating to the Student Loan Agreement.

RESPONSE:

Defendant objects to the term "all" as used in this request as overly broad and unduly burdensome. Defendant has made a good faith, reasonable, and diligent effort to locate responsive information. In searching for information, Defendant conducted a thorough and reasonable search for records kept by Defendant in the ordinary course where such information is most likely to be found.  Without waiving the objection, see all documents produced herewith.

REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6:  Any and all documents relating to

the chain of title from inception of the Student Loan Agreement between Plaintiff and GMAC

Bank including but not limited to all assignments, Note Purchase Agreements, Deposit and Sale

Agreements with all schedules and exhibits between GMAC Bank, NCSLT and any and all third

parties.

RESPONSE:  Defendant objects to producing the entire exhibit to the Deposit and Sale
Agreement as it lists the names and nonpublic information of all borrowers of all the loans
covered by the Agreement.  Without waiving the objection, Defendant produces the Pool
Supplement and Deposit and Sale Agreement and exhibit thereto.

REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7:  Please produce an accounting of

amounts collected from cases identified in Interrogatory No. 9.

RESPONSE:

Defendant objects to the Request as it is wholly irrelevant to the subject matter of the complaint
and is not reasonably calculated to lead to the discovery of admissible evidence.

DATED  February 8, 2019

<div style="margin-left:40%">

Respectfully Submitted,

ROSE L. BRAND & ASSOCIATES, P.C.

By /s/Andrew P. Yarrington
   ANDREW YARRINGTON
   Attorney for National Collegiate Student
   Loan Trust 2006-2
   7430 Washington Street, NE
   Albuquerque, NM 87109
   Telephone: (505) 833-3036
   Andrew.Yarrington@roselbrand.com

</div>

## 2006-2 POOL SUPPLEMENT
## GMAC BANK

This Pool Supplement (the "Supplement") is entered into pursuant to and forms a part of that certain Note Purchase Agreement (the "Agreement") dated as of May 30, 2003, as amended or supplemented from the date of execution of the Agreement through the date of this Supplement, by and between The First Marblehead Corporation and GMAC Bank (the "Program Lender"). This Supplement is dated as of June 8, 2006. Capitalized terms used in this Supplement without definitions have the meanings set forth in the Agreement.

Article 1: Purchase and Sale.

In consideration of the Minimum Purchase Price set forth below, the Program Lender hereby transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the "Depositor"), upon the terms and conditions set forth in the Agreement (which are incorporated herein by reference with the same force and effect as if set forth in full herein), each GMAC Bank Conforming Loan described in the attached Schedule 1 (the "Transferred GMAC Bank Loans") along with all of the Program Lender's rights under the Guaranty Agreement, and any agreement pursuant to which TERI granted collateral for its obligations under the Guaranty Agreement, relating to the Transferred GMAC Bank Loans. The Depositor in turn will sell the Transferred GMAC Bank Loans to The National Collegiate Student Loan Trust 2006-2 (the "Trust"). The Program Lender hereby transfers and delivers to the Depositor each GMAC Bank Note evidencing such GMAC Bank Conforming Loan and all Origination Records relating thereto, in accordance with the terms of the Agreement. The Depositor hereby purchases said GMAC Bank Notes on said terms and conditions.

Article 2: Price.

The amount paid pursuant to this Supplement is the Minimum Purchase Price, as that term is defined in Section 2.04 of the Agreement.

Article 3: Representations and Warranties.

3.01.   By Program Lender.

The Program Lender repeats the representations and warranties contained in Section 5.02 of the Agreement for the benefit of each of the Depositor and the Trust and confirms the same are true and correct as of the date hereof with respect to the Agreement and to this Supplement.

3.02.   By Depositor.

The Depositor hereby represents and warrants to the Program Lender that at the date of execution and delivery of this Supplement by the Depositor:

(a)   The Depositor is duly organized and validly existing as a limited liability company under the laws of the State of Delaware with the due power and authority to own its

properties and to conduct its business as such properties are currently owned and such business is presently conducted, and had at all relevant times, and has, the power, authority and legal right to acquire and own the Transferred GMAC Bank Loans.

(b)     The Depositor is duly qualified to do business and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications.

(c)     The Depositor has the power and authority to execute and deliver this Supplement and to carry out its respective terms; the Depositor has the power and authority to purchase the Transferred GMAC Bank Loans and rights relating thereto as provided herein from the Program Lender, and the Depositor has duly authorized such purchase from the Program Lender by all necessary action; and the execution, delivery and performance of this Supplement has been duly authorized by the Depositor by all necessary action on the part of the Depositor.

(d)     This Supplement, together with the Agreement of which this Supplement forms a part, constitutes a legal, valid and binding obligation of the Depositor, enforceable in accordance with its terms.

(e)     The consummation of the transactions contemplated by the Agreement and this Supplement and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the governing instruments of the Depositor or any indenture, agreement or other instrument to which the Depositor is a party or by which it is bound; or result in the creation or imposition of any lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument; or violate any law or any order, rule or regulation applicable to the Depositor of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties.

(f)     There are no proceedings or investigations pending, or threatened, before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties: (i) asserting the invalidity of the Agreement or this Supplement, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Agreement or this Supplement, or (iii) seeking any determination or ruling that is likely to materially or adversely affect the performance by the Depositor of its obligations under, or the validity or enforceability of the Agreement or this Supplement.

Article 4:  Cross Receipt.

The Program Lender hereby acknowledges receipt of the Minimum Purchase Price.  The Depositor hereby acknowledges receipt of the Transferred GMAC Bank Loans included in the Pool.

<u>Article 5: Assignment of Origination, Guaranty and Servicing Rights.</u>

The Program Lender hereby assigns and sets over to the Depositor any claims it may now or hereafter have under the Guaranty Agreement, the Origination Agreement, and the Servicing Agreement to the extent the same relate to the Transferred GMAC Bank Loans described in <u>Schedule 1</u>, other than any right to obtain servicing after the date hereof. It is the intent of this provision to vest in the Depositor any claim of the Program Lender relating to defects in origination, guaranty or servicing of the loans purchased hereunder in order to permit the Depositor to assert such claims directly and obviate any need to make the same claims against the Program Lender under this Supplement. The Program Lender also hereby assigns and sets over to the Depositor any claims it may now have or hereafter have to any collateral pledged by TERI to the Program Lender to secure its obligations under the Guaranty Agreement that relates to the Transferred Loans, and Program Lender hereby releases any security interest it may have in such collateral. Program Lender hereby authorizes the Depositor, its successors and assigns, to file in any public filing office where a Uniform Commercial Code Filing with respect to collateral pledged by TERI is of record, any partial release or assignment that it deems necessary or appropriate to reflect in the public records the conveyance and assignment effected hereby.

[Remainder of page intentionally blank]

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION

By: _____
    Donald R. Peck
    Executive Vice President

GMAC BANK

By: _____
    Name:
    Title:

THE NATIONAL COLLEGIATE FUNDING LLC

By:    GATE Holdings, Inc., Member

By: _____
    John A. Hupalo
    Vice President

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION

By: _____
    Name:
    Title:

GMAC BANK

By: _____
    Name: MICHAEL P. DiCoro
    Title: SVP

THE NATIONAL COLLEGIATE FUNDING LLC

By:    GATE Holdings, Inc., Member

By: _____
    Name:
    Title:

```
BORROWER SSN: ***-**-8657 NAME: MARIE J GOMEZ
1ST DISB DATE: 08/02/05   OWNER: NCT                    LOAN PGM: ALPLN
LOAN SEQ: 001          GUARANTOR: TERI
```

|   | DEFER/FORB TYP | BEGIN DATE | END DATE | GRACE END DATE | CAP IND | DAYS USED | DAYS LEFT | TOTL MOS USED | CERT DATE |
|---|---|---|---|---|---|---|---|---|---|
| _ | F - ADMINISTRV | 04 02 10 | 04 30 10 | | Y | 29 | UNL | 1.0 | 04 30 10 |
| _ | F - GEN/TEMP | 06 01 08 | 11 30 08 | | Y | 183 | 154 | 6.9 | 08 21 08 |
| _ | F - GEN/TEMP | 02 01 07 | 02 28 07 | | Y | 28 | 154 | 6.9 | 02 10 07 |
| _ | F - BANKRUPTCY | 04 10 06 | 11 08 06 | | Y | 213 | UNL | 7.0 | 11 13 06 |
| _ | | __ __ __ | __ __ __ | | _ | | | | |
| _ | | __ __ __ | __ __ __ | | _ | | | | |
| _ | | __ __ __ | __ __ __ | | _ | | | | |

```
 F1=HELP  F3=EXIT  F5=RFR  F6=ELG  F7=BKWD  F8=FWD  F9=PRT  F10=HIST  F12=CAN
```

## DEPOSIT AND SALE AGREEMENT
## THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2

This DEPOSIT AND SALE AGREEMENT (the "Sale Agreement"), dated as of June 8, 2006, between The National Collegiate Funding LLC, in its capacity as seller (in such capacity, the "Seller"), and The National Collegiate Student Loan Trust 2006-2, as purchaser (the "Purchaser"), shall be effective upon execution by the parties hereto.

WHEREAS, the Seller is the owner of certain student loans; and

WHEREAS, the Seller desires to sell its interest in such student loans and the Purchaser desires to purchase such loans from the Seller.

NOW, THEREFORE, in connection with the mutual promises contained herein, the parties hereto agree as follows:

## ARTICLE I
## TERMS

This Sale Agreement sets forth the terms under which the Seller is selling and the Purchaser is purchasing the student loans listed on Schedule 2 to each of the Pool Supplements set forth on Schedule A attached hereto (the "Transferred Student Loans").

## ARTICLE II
## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the definitions set forth in Appendix A of the Indenture dated as of June 1, 2006 between U.S. Bank National Association (the "Indenture Trustee") and the Purchaser.

## ARTICLE III
## SALE AND PURCHASE

Section 3.01.  Sale of Loans.  The Seller hereby sells and the Purchaser hereby purchases the Transferred Student Loans.

Section 3.02.  Assignment of Rights.  The Seller hereby assigns to the Purchaser and the Purchaser hereby accepts all of the Seller's rights and interests under each of the Pool Supplements listed on Schedule A attached hereto and the related Student Loan Purchase Agreements listed on Schedule B attached hereto.

Section 3.03.  Settlement of the Payment.  The Purchaser shall pay the Seller the purchase price set forth in Schedule 1 of each of the Pool Supplements by wire transfer in immediately available funds to the account specified by the Seller.

SSL-DOCS2 70280522v5

Section 3.04. <u>Assistance by Seller</u>. Following the execution of this Sale Agreement, the Seller shall provide any reasonable assistance requested by the Purchaser in determining that all required documentation on the Transferred Student Loans is present and correct.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

Section 4.01. <u>General</u>. The Seller represents and warrants to the Purchaser that as of the date of this Sale Agreement:

(a)     The Seller is duly organized and existing under the laws of the State of Delaware; and

(b)     The Seller has all requisite power and authority to enter into and to perform the terms of this Sale Agreement.

Section 4.02. <u>Loan Representations</u>. The Seller represents and warrants to the Purchaser that with respect to each Transferred Student Loan purchased by the Purchaser pursuant to this Sale Agreement, the Seller is making the same representations and warranties made by the respective program lender with respect to each Transferred Student Loan pursuant to the respective Student Loan Purchase Agreement listed on <u>Schedule B</u> attached hereto.

Section 4.03. <u>Covenants</u>. The Seller, in its capacity as purchaser of the Transferred Student Loans pursuant to the Pool Supplements, hereby covenants that it will enforce the covenants and agreements of each program lender in the respective Student Loan Purchase Agreement and related Pool Supplement. The Seller further covenants that it will not waive, amend, modify, supplement or terminate any Student Loan Purchase Agreement or Pool Supplement or any provision thereof without the consent of the Purchaser, which consent the Purchaser hereby agrees not to provide without the prior written consent of the Indenture Trustee and the Interested Noteholders in accordance with the Purchaser's covenant in Section 3.07(c) of the Indenture.

## ARTICLE V
## PURCHASE OF LOANS; REIMBURSEMENT

Each party to this Sale Agreement shall give notice to the other such parties and to the Servicers, First Marblehead Data Services, Inc. and Wilmington Trust Company (the "<u>Owner Trustee</u>") promptly, in writing, upon the discovery of any breach of the Seller's representations and warranties made pursuant to this Sale Agreement which has a materially adverse effect on the interest of the Purchaser in any Transferred Student Loan. In the event of such a material breach, the Seller shall cure or repurchase the Transferred Student Loan in accordance with the remedies set forth in the respective Student Loan Purchase Agreement.

## ARTICLE VI
## LIABILITY OF SELLER; INDEMNITIES

The Seller shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by the Seller under this Sale Agreement.

2

(a)     The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any taxes that may at any time be asserted against any such Person with respect to the transactions contemplated herein and in the other Basic Documents (except any such income taxes arising out of fees paid to the Owner Trustee), including any sales, gross receipts, general corporation, tangible and intangible personal property, privilege or license taxes and costs and expenses in defending against the same.

(b)     The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any and all costs, expenses, losses, claims, damages and liabilities arising out of, or imposed upon such Person through, the Seller's willful misfeasance, bad faith or gross negligence in the performance of its duties under this Sale Agreement, or by reason of reckless disregard of its obligations and duties under this Sale Agreement.

Indemnification under this Section shall survive the termination of this Sale Agreement and shall include reasonable fees and expenses of counsel and expenses of litigation.  If the Seller shall have made any indemnity payments pursuant to this Section and the Person to or for the benefit of whom such payments are made thereafter shall collect any of such amounts from others, such Person shall promptly repay such amounts to the Seller, without interest.

## ARTICLE VII
## MERGER OR CONSOLIDATION OF, OR ASSUMPTION
## OF THE OBLIGATIONS OF, SELLER

Any Person (a) into which the Seller may be merged or consolidated, (b) which may result from any merger or consolidation to which the Seller shall be a party or (c) which may succeed to the properties and assets of the Seller substantially as a whole, shall be the successor to the Seller without the execution or filing of any document or any further act by any of the parties to this Sale Agreement; provided, however, that the Seller hereby covenants that it will not consummate any of the foregoing transactions except upon satisfaction of the following:  (i) the surviving Person, if other than the Seller, executes an agreement of assumption to perform every obligation of the Seller under this Sale Agreement, (ii) immediately after giving effect to such transaction, no representation or warranty made pursuant to this Sale Agreement shall have been breached, (iii) the surviving Person, if other than the Seller, shall have delivered an Officers' Certificate and an opinion of counsel each stating that such consolidation, merger or succession and such agreement of assumption comply with this Section and that all conditions precedent, if any, provided for in this Sale Agreement relating to such transaction have been complied with, and that the Rating Agency Condition shall have been satisfied with respect to such transaction, (iv) if the Seller is not the surviving entity, such transaction will not result in a material adverse federal or state tax consequence to the Purchaser or the Noteholders, and (v) if the Seller is not the surviving entity, the Seller shall have delivered an opinion of counsel either (A) stating that, in the opinion of such counsel, all financing statements and continuation statements and amendments thereto have been executed and filed that are necessary fully to preserve and protect the interest of the Purchaser in the Transferred Student Loans and reciting the details of such filings, or (B) stating that, in the opinion of such counsel, no such action shall be necessary to preserve and protect such interests.

3

## ARTICLE VIII
## LIMITATION ON LIABILITY OF SELLER AND OTHERS

The Seller and any director or officer or employee or agent thereof may rely in good faith on the advice of counsel or on any document of any kind, prima facie properly executed and submitted by any Person respecting any matters arising hereunder (provided that such reliance shall not limit in any way the Seller's obligations under this Sale Agreement). The Seller shall not be under any obligation to appear in, prosecute or defend any legal action that shall not be incidental to its obligations under this Sale Agreement or the Student Loan Purchase Agreements, and that in its opinion may involve it in any expense or liability.

## ARTICLE IX
## SURVIVAL OF COVENANTS

All covenants, agreements, representations and warranties made herein shall survive the consummation of the purchase of the Transferred Student Loans; provided, however, that to the extent any of the same relate to a corresponding covenant, agreement, representation or warranty contained in a Student Loan Purchase Agreement, the same shall survive to the extent that such corresponding covenant, agreement, representation or warranty survives the applicable Student Loan Purchase Agreement. All covenants, agreements, representations and warranties made or furnished pursuant hereto by or for the benefit of the Seller shall bind and inure to the benefit of any successors or assigns of the Purchaser, **including the Indenture Trustee**. This Sale Agreement may be changed, modified or discharged, and any rights or obligations hereunder may be waived, only by a written instrument signed by a duly authorized officer of the party against whom enforcement of any such waiver, change, modification or discharge is sought. The waiver by the Indenture Trustee, at the direction of the Noteholders pursuant to the Indenture, of any covenant, agreement, representation or warranty required to be made or furnished by the Seller or the waiver by the Indenture Trustee, at the direction of the Noteholders pursuant to the Indenture, of any provision herein contained shall not be deemed to be a waiver of any breach of any other covenant, agreement, representation, warranty or provision herein contained, nor shall any waiver or any custom or practice which may evolve between the parties in the administration of the terms hereof, be construed to lessen the right of the Indenture Trustee, at the direction of the Noteholders pursuant to the Indenture, to insist upon the performance by the Seller in strict accordance with said terms.

## ARTICLE X
## COMMUNICATION AND NOTICE REQUIREMENTS

All communications, notices and approvals provided for hereunder shall be in writing and mailed or delivered to the Seller or the Purchaser, as the case may be. Notice given in any such communication, mailed to the Seller or the Purchaser by appropriately addressed registered mail, shall be deemed to have been given on the day following the date of such mailing and shall be addressed as follows:

4

If to the Purchaser, to:

> The National Collegiate Student Loan Trust 2006-2
> c/o Wilmington Trust Company, as Owner Trustee
> 100 North Market Street
> Wilmington, Delaware 19890-0001
> Attention: Corporate Trust Department

If to the Seller, to:

> The National Collegiate Funding LLC
> c/o First Marblehead Data Services, Inc.
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Ms. Rosalyn Bonaventure

with a copy to:

> First Marblehead Corporation
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Corporate Law Department

or to such other address as either party shall have provided to the other parties in writing. Any notice required to be in writing hereunder shall be deemed given if such notice is mailed by certified mail, postage prepaid, or hand delivered to the address of such party as provided above.

<div align="center">

**ARTICLE XI**
**AMENDMENT**

</div>

This Sale Agreement may be amended by the parties hereto without the consent of the Noteholders for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Sale Agreement or of modifying in any manner the rights of such Noteholders; provided that such action will not, in the opinion of counsel satisfactory to the Indenture Trustee, materially affect the interest of any such Noteholder.

In addition, this Sale Agreement may also be amended from time to time by the Seller and the Purchaser, with the consent of the Noteholders of the Notes evidencing a majority of the Outstanding Amount of the Notes and the consent of the Certificateholders of the Certificates evidencing a majority of the outstanding principal amount of the Certificates, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Sale Agreement or of modifying in any manner the rights of the Noteholders or the Certificateholders, respectively; provided, however, that no such amendment shall (a) increase or reduce in any manner the amount of, or accelerate or delay the time of, collections of payments with respect to Transferred Student Loans or distributions that shall be required to be made for the benefit of the Noteholders, or (b) reduce the aforesaid percentage of the Outstanding Amount

<div align="center">5</div>

of the Notes or the Certificates, the Noteholders or the Certificateholders of which are required to consent to any such amendment, without the consent of all outstanding Noteholders or Certificateholders, respectively.

Promptly after the execution of any such amendment or consent (or, in the case of the Rating Agencies, five Business Days prior thereto), the Purchaser shall furnish written notification of the substance of such amendment or consent to the Indenture Trustee and each of the Rating Agencies.

It shall not be necessary for the consent of Noteholders pursuant to this Section to approve the particular form of any proposed amendment or consent, but it shall be sufficient if such consent shall approve the substance thereof.

Prior to the execution of any amendment to this Sale Agreement, the Owner Trustee shall be entitled to receive and rely upon an opinion of counsel stating that execution of such amendment is authorized or permitted by this Sale Agreement. The Owner Trustee may, but shall not be obligated to, enter into any such amendment which affects the Owner Trustee's own rights, duties or immunities under this Sale Agreement or otherwise.

## ARTICLE XII
## ASSIGNMENT

The Seller hereby assigns its entire right, title and interest as purchaser under this Sale Agreement and the Student Loan Purchase Agreement thereunder to the Purchaser as of the date hereof and acknowledges that the Purchaser will assign the same, together with the right, title and interest of the Purchaser hereunder, to the Indenture Trustee under the Indenture.

## ARTICLE XIII
## GOVERNING LAW

**THIS SALE AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT OTHERWISE WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.**

## ARTICLE XIV
## LIMITATION OF LIABILITY OF OWNER TRUSTEE

Notwithstanding anything contained herein to the contrary, this instrument has been executed by Wilmington Trust Company, not in its individual capacity but solely in its capacity as Owner Trustee of the Purchaser, and in no event shall Wilmington Trust Company in its individual capacity or any beneficial owner of the Purchaser have any liability for the representations, warranties, covenants, agreements or other obligations of the Purchaser hereunder, as to all of which recourse shall be had solely to the assets of the Purchaser. For all purposes of this Sale Agreement, in the performance of any duties or obligations of the Purchaser

6

hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VIII, IX and X of the Trust Agreement.

[Signature Pages Follow]

SSL-DOCS2 70280522v5

IN WITNESS WHEREOF, the parties hereto have caused this Sale Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

THE NATIONAL COLLEGIATE FUNDING LLC,
as Seller

By: GATE Holdings, Inc., Member

By: _____
Name: John A. Hupalo
Title: Vice/President

THE NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-2, as Purchaser

By: WILMINGTON TRUST COMPANY, not in its
individual capacity but solely as Owner Trustee

By: _____
Name:
Title:

[Signature Page to Deposit and Sale Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Sale Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

THE NATIONAL COLLEGIATE FUNDING LLC,
    as Seller

By: GATE Holdings, Inc., Member

By: _____
    Name: John A. Hupalo
    Title:   Vice President

THE NATIONAL COLLEGIATE STUDENT LOAN
    TRUST 2006-2, as Purchaser

By: WILMINGTON TRUST COMPANY, not in its
    individual capacity but solely as Owner Trustee

By: _____
    Name:
    Title:        **EMMETT R. HARMON**
                    **VICE PRESIDENT**

[Signature Page to Deposit and Sale Agreement]

## SCHEDULE A

### *Pool Supplements*

Each of the following Pool Supplements was entered into by and among The First Marblehead Corporation, The National Collegiate Funding LLC and:

- Bank of America, N.A., dated June 8, 2006, for loans that were originated under Bank of America's BAGEL Loan Program, CEDU Loan Program, Direct to Consumer Loan Program and ISLP Loan Program.
- Bank One, N.A., dated June 8, 2006, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program and M&T REFERRAL Loan Program.
- Charter One Bank, N.A., dated June 8, 2006, for loans that were originated under the following Charter One programs: AAA Southern New England Bank, AES EducationGAIN Loan Program, Axiom Alternative Loan Program, CFS Direct to Consumer Loan Program, Citibank Flexible Education Loan Program, College Board Alternative Loan Program, College Loan Corporation Loan Program, Collegiate Solutions Alternative Loan Program, Comerica Alternative Loan Program, Custom Educredit Loan Program, EdFinancial Loan Program, Extra Credit II Loan Program (North Texas Higher Education), M&I Alternative Loan Program, National Education Loan Program, NextStudent Alternative Loan Program, NextStudent Private Consolidation Loan Program, SAF Alternative Loan Program, START Education Loan Program, and UPromise Alternative Loan Program,
- Chase Manhattan Bank USA, N.A., dated June 8, 2006, for loans that were originated under Chase's Chase Extra Loan Program.
- Citizens Bank of Rhode Island, dated June 8, 2006, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program, Alternative Loan Program, Navy Federal Referral Loan Program, FinanSure Loan Program, and Xanthus Loan Program.
- First National Bank Northeast, dated June 8, 2006, for loans that were originated under First National Bank Northeast's CASL Alternative Loan Program.
- GMAC Bank, dated June 8, 2006, for loans that were originated under GMAC Bank's Alternative Loan Program.
- HSBC Bank USA, National Association, dated June 8, 2006, for loans that were originated under the HSBC Loan Program.
- The Huntington National Bank, dated June 8, 2006, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.
- Manufacturers and Traders Trust Company, dated June 8, 2006, for loans that were originated under Manufacturers and Traders Trust Company's M&T Alternative Loan Program.
- PNC Bank, N.A., dated June 8, 2006, for loans that were originated under PNC Bank's PNC Bank Alternative Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, and Regions Bank Alternative Loan Program.
- Sovereign Bank, dated June 8, 2006, for loans that were originated under Sovereign Bank's Alternative Loan Program.

A-1

- SunTrust Bank, dated June 8, 2006, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.
- TCF National Bank, dated June 8, 2006, for loans that were originated under TCF National Bank's Alternative Loan Program.
- U.S. Bank, N.A., dated June 8, 2006, for loans that were originated under U.S Bank's Alternative Loan Program.

A-2

## SCHEDULE B

### *Student Loan Purchase Agreements*

Each of the following Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BAGEL Loan Program, CEDU Loan Program and ISLP Loan Program.
- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.
- Bank of America, N.A., dated April 1, 2006, for loans that were originated under Bank of America's Direct to Consumer Loan Program.
- Bank One, N.A., dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program and EDUCATION ONE Loan Program.
- Bank One, N.A., dated July 26, 2002, for loans that were originated under Bank One's M&T REFERRAL Loan Program
- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.
- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.
- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Flexible Education Loan Program.
- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.
- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.
- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's <u>EdFinancial</u> Loan Program.
- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).
- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.
- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.
- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.
- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's START Education Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.

B-1

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program (including loans in the UPromise, Collegiate Solutions, College Board, and Axiom Alternative Loan Programs).
- Chase Manhattan Bank USA, N.A., dated September 30, 2003, as amended on March 1, 2004, September 8, 2004 and February 25, 2005, for loans that were originated under Chase's Chase Extra Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's DTC Alternative Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Navy Federal Referral Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Xanthus Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's FinanSure Alternative Loan Program.
- First National Bank Northeast, dated August 1, 2001, for loans that were originated under First National Bank Northeast's CASL Undergraduate Alternative Loan Program.
- GMAC Bank, dated May 30, 2003, for loans that were originated under GMAC Bank's Alternative Loan Program
- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.
- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.
- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.
- National City Bank, dated November 13, 2002, for loans that were originated under National City Bank's National City Loan Program.
- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Loan Program.
- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Brazos Alternative Loan Program.
- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Edvisors Alternative Loan Program.
- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Regions Bank Alternative Loan Program.
- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.
- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.
- TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.
- U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

SSL-DOCS2 70280522v5

| National Collegiate Student Loan Trust 2006-2 | | | | |
|---|---|---|---|---|
| **Roster:** | **GMAC BANK** | | | |
| Lender | Lender Code | Marketer | Loan Product | Loan ID |
| GMAC BANK | 900005PM | GMAC Bank | DTC - Undergraduate - Affinity | 02961441 |

| SSN | Disb. Date | Tier | Repay Type | Margin |
|---|---|---|---|---|
| 8657 | 02-Aug-05 | 3 | IM | 0.045 |

| Fee to Borrower | TERI Admin Fee | Marketing Fee | Total Gross Disbursed | Total Net Disbursed |
|---|---|---|---|---|
| 0.07 | 0.015 | 0.0375 | $29,591.40 | $27,520.00 |

| Total Net Principal | Total Capitalized Interest | Total Outstanding Gross Principal | Total Outstanding Unpaid Interest | Administrative Fee Reimbursement on 0% Fee Loans |
|---|---|---|---|---|
| $27,243.15 | $0.00 | $29,293.71 | $459.38 | $0.00 |

| | | | | Final Reconciliation Settlement Figures |
|---|---|---|---|---|
| Origination Fee Reimbursement Due Bank | Total Marketing Fees | Marketing Fees Due FMC | Marketing Fees Due Bank | Total Amount Due Bank |
| $100.00 | $1,021.62 | $0.00 | $1,021.62 | $30,874.71 |

EX-19 10 national-ex9912_061206.htm EXHIBIT 99.12

---
**CONFIDENTIAL MATERIALS OMITTED AND FILED SEPARATELY WITH THE
SECURITIES AND EXCHANGE COMMISSION.
ASTERISKS DENOTE OMISSIONS.**

---

**Note: This Agreement contains confidential & proprietary information and may not be
disclosed without theconsent
of both parties or as required by law**

## GUARANTY AGREEMENT
### between
### THE EDUCATION RESOURCES INSTITUTE, INC.
### and
### GMAC BANK

This Guaranty Agreement (this "Agreement") is made as of this 30th day of May, 2003, by and
between The Education Resources Institute, Inc. ("TERI"), a private non-profit corporation organized
under Chapter 180 of the Massachusetts General Laws with its principal place of business at 31 St.
James Avenue, 6th Floor, Boston, Massachusetts 02116, and GMAC Bank, (the "LENDER"), a
federal savings bank having a place of business located at 3710 Kennett Pike, Greenville, DE 19807.

WHEREAS, TERI is in the business of providing financial assistance in the form of loan
guaranties to and on behalf of students enrolled in programs of higher education and their parents at
TERI-approved schools; and

WHEREAS, the LENDER is willing to make Loans to eligible Borrowers under the Program,
and TERI is willing to guaranty the payment of principal and interest against the Borrowers' default or
certain other events as more fully described below, in accordance with the terms and conditions set
forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, TERI and the
LENDER agree as follows:

Section 1:     DEFINITIONS

As used in this Agreement the following terms shall have the following meanings:

1.1   "Agent" shall mean State Street Bank and Trust Company, its successors and assigns, in its
      capacity as Agent under the Deposit and Security Agreement among TERI, the LENDER, the
      Agent, and the First Marblehead Corporation ("FMC") of even date herewith (the "Deposit and
      Security Agreement").

1.2   "Borrower" shall mean the person, or all persons collectively, including all students, cosigners,
      coborrowers, guarantors, endorsers, and accommodation parties, who execute a Promissory Note
      individually or, in the case of multiple Borrowers, severally and jointly, for the purpose of
      obtaining funds from the LENDER under the Program.

1.3

"Due Diligence" shall mean the utilization by the LENDER of policies, practices and procedures in the origination, servicing and collection of Loans that comply with the standards set forth in the Program Guidelines and that comply with the requirements of federal and state law and regulation.

1.4  "Guaranty Claim" shall mean a claim by the LENDER to TERI for a guaranty payment with respect to a Loan pursuant to Section 2.1 of this Agreement.

1.5  "Guaranty Event" shall mean any of the following events with respect to a Loan:

   a.   failure of a Borrower to make monthly principal and/or interest payments on a Loan when due, provided such failure persists for a period of one hundred eighty (180) consecutive days,

   b.   the filing of a petition in bankruptcy with respect to a Borrower,

   c.   the death of a Borrower, or

   d.   fraud in the execution of a Promissory Note.

        For Loans on which the Borrower is two or more persons, none of the above, with the exception of paragraph b. and d, shall be a Guaranty Event unless one or more such events shall have occurred with respect to all such persons. The foregoing notwithstanding, if a Borrower files a petition in bankruptcy pursuant to Chapter 7 of the U.S. Bankruptcy Code and does not seek a discharge of the affected Loan(s) under 11 U.S.C. §523(a)(8)(B) of the U.S. Bankruptcy Code, the LENDER at TERI's request will withdraw its guaranty claim unless or until one of the other Guaranty Events shall have occurred with respect thereto.

1.6  "Loan" shall mean a loan of funds, including all disbursements thereof, made by the LENDER to a Borrower under the Program.

1.7  "Note Purchase Agreement" means the agreement of that name between LENDER and The First Marblehead Corporation ("FMC") dated as of even date herewith, as it may be amended from time to time.

1.8  "Program" shall mean the GMAC Bank Student Loan Program as more fully described in the Program Guidelines.

1.9  "Program Guidelines" shall mean the GMAC Bank Student Loan Program Guidelines attached hereto as Exhibit A, and all changes thereto as provided in Section 6 hereof. The Program Guidelines (a) consist of the Program Overview, the TERI Underwriting, Origination and Loan Term Guidelines, the Servicing Guidelines, and Program Borrower Documents (consisting of the forms of Promissory Note and Truth in Lending Disclosure) and (b) are hereby incorporated in this Agreement by reference and made a part hereof.

1.10 "Promissory Note" shall mean a promissory note evidencing a Loan executed by a Borrower in the form attached hereto as part of the Program Guidelines or as approved pursuant to Section 3.2 below.

1.11 "Securitization Transaction" shall mean and refer to (a) a purchase of Loans guaranteed hereunder by a special purpose entity ("SPE") formed by FMC, which purchase is funded through the issuance of debt instruments or other securities by such entity, the repayment of which is supported by payments on the Loans or (b) any other transaction whereby a Loan is transferred from the LENDER to FMC or one of its affiliates.

Section 2:    GUARANTY OF LOANS

2.1 TERI hereby guarantees to the LENDER, unconditionally except as set forth in Section 2.2 below, the payment of 100% of the principal of and accrued interest on every Loan as to which a Guaranty Event has occurred. "Accrued interest" shall mean interest accrued and unpaid to the date of payment in full by TERI of a Guaranty Claim, less any interest that shall have accrued after the filing of a Guaranty Claim but before TERI shall have received all the documentation necessary to process the Guaranty Claim as set forth in the Program Guidelines. TERI will use all reasonable efforts to make payment on its guaranty within sixty (60) days, and will in any event make payment within ninety (90) days, of receipt by TERI of a Guaranty Claim from the LENDER stating the name of the Borrower and the type of Guaranty Event that has occurred accompanied by the full claim documentation required in the Program Guidelines.

2.2 TERI's guaranty is conditioned upon the following:

a. The LENDER must have filed its Guaranty Claim within the time period and following the procedures specified in the Program Guidelines.

b. The LENDER and its predecessors in interest must at all times have exercised Due Diligence with respect to the Loan in question (or shall have cured any failure to exercise Due Diligence under the reinstatement provisions in Section 2.4 hereof and the Program Guidelines), and must have complied with all other requirements of the Program Guidelines applicable to the Loan.

c. The LENDER shall have paid to TERI the Guaranty Fee in accordance with Section 3.3 below and Schedule 3.3.

d. TERI must have received from the LENDER the Promissory Note relating to the Loan in question, (i) executed in accordance with the Servicing Guidelines (set forth within th Program Guidelines), (ii) enforceable against the Borrower (except as provided in this Section 2.2.d., below), and (iii) endorsed to TERI in such manner as to transfer to TERI all rights in and title to such Promissory Note, free and clear of all liens and encumbrances, and of all defenses, counterclaims, offsets, and rights of rescission that might be raised by the Borrower. Submission of a Guaranty Claim to TERI shall constitute the LENDER's certification that the conditions of 2.2.b. and 2.2.d. have been met, and TERI is entitled to rely on such certification.

Subsections 2.2.b. and 2.2.d. above notwithstanding, if a Loan that is the subject of a Guaranty Claim was originated by TERI on behalf of the LENDER pursuant to a Loan Origination Agreement between the parties, (i) TERI will not deny the LENDER's Guaranty Claim on such Loan if the sole basis for denial is a violation of the Program Guidelines or a violation of Massachusetts or federal law committed by TERI in the

origination process, and (ii) TERI will have no recourse against the LENDER in the event that TERI's actions or omissions in the origination process shall have given rise to a successful defense in favor of the Borrower in a suit on the Promissory Note relating to such Loan.

2.3   TERI's guaranty obligation with respect to any Loan shall not be terminated or otherwise affected or impaired (i) by the LENDER's or its servicer's granting an extension of time to the Borrower to make scheduled payments, or by any other indulgence the LENDER may grant to the Borrower, provided that all extensions and other indulgences meet the forbearance standards and other requirements of the Program Guidelines; or, Section 2.2.d. above notwithstanding, (ii) because of any fraud in the execution of the Promissory Note relating to such Loan, (iii) because of any illegal or improper acts of the Borrower, or (iv) because the Borrower may be relieved of liability for such Loan due to lack of contractual capacity or any other statutory exemption.

2.4   Except as provided in sections 2.2 and 2.3 above, TERI may deny the LENDER's Guaranty Claim on any Loan on the grounds of Due Diligence deficiencies. If TERI properly denies the LENDER's Guaranty Claim on any Loan on the grounds of Due Diligence deficiencies, the LENDER may thereafter require that TERI reinstate the guaranty of such Loan if (a) the LENDER corrects such deficiencies and receives four (4) consecutive full on-time monthly payments from the Borrower, according to any schedule permitted by the Program Guidelines, and if at the time of the LENDER's request the Borrower is within thirty (30) days of being current on all principal and interest payments on such Loan, or (b) the LENDER satisfies any other method of cure set forth in the Program Guidelines.

2.5   TERI's guaranty hereunder is a continuing and absolute guaranty of payment and not merely of collection, covering Loans made in accordance herewith based upon applications received by the LENDER prior to termination of this Agreement; and such termination shall not affect TERI's obligations to the LENDER then existing, whether direct or indirect, absolute or contingent, then due or thereafter to become due.

2.6   TERI agrees not to exercise any right of subrogation, reimbursement, indemnity, contribution or the like against the Borrower of any Loan unless and until all of TERI's obligations to the LENDER under this Agreement with respect to such Loan have been satisfied in full, except to the extent that it is deemed a valid claimant as a contingent creditor, for example, under Title 11 of the United States Code (the "Bankruptcy Code"), or applicable state law.

2.7   TERI will permit the LENDER, any duly designated representative of the LENDER, or any governmental body having jurisdiction over the LENDER (subject to written notice being provided to TERI by the LENDER, identifying the requesting party and the date of the review), to examine and audit the books and records of TERI pertaining to the Loans, at any time during TERI's regular business hours, provided that in the case of examinations by the LENDER or its representative, absent good cause (i) TERI must be given ten (10) business days' prior written notice and, (ii) no more than one such audit may be conducted with respect to any twelve-month period or will take place in any twelve-month period. In no event will any audit be performed during July, August, September, or October in any year except at the request of a regulatory authority having jurisdiction over the LENDER.

2.8   TERI will indemnify the LENDER and hold it harmless from and against any loss, cost, damage or expense that the LENDER may suffer as a result of claims to the extent they arise out of

TERI's actions or omissions relative to the LENDER's participation in the Program and do not arise out of the LENDER's actions or omissions. "Expense" includes, without limitation, the LENDER's reasonable attorney's fees. TERI will further indemnify the LENDER and hold it harmless from and against any claim brought against the LENDER by any Borrower based on actions or omissions of the LENDER that were mandated under the Program Guidelines.

2.9   The LENDER acknowledges that TERI's approval of a servicer is in no way an endorsement of such servicer and that TERI shall have no liability to the LENDER for any losses arising from such servicer's failure to comply with Due Diligence or the Program Guidelines or applicable law, nor shall TERI be required to honor any claim submitted by such servicer if the claim does not comply with the requirements of this Agreement.

Section 3:      OBLIGATIONS OF THE LENDER

3.1   In originating (in the event and to the extent TERI is not performing origination services for Lender), servicing, disbursing, and collecting Loans, the LENDER will comply, and cause its servicer and others acting on its behalf to comply, at all times with all Program Guidelines (including Due Diligence requirements) and all applicable requirements of federal and state laws and regulations.

3.2   a.    The LENDER will use Promissory Notes, Loan applications, disclosure statements, and other forms mutually agreeable to the parties. The forms of Promissory Notes, Loan applications and disclosure statement attached hereto as part of the Program Guidelines are agreed to be satisfactory to both parties. Without limiting the generality of Sections 3.1 and 4.1, the LENDER warrants the conformity of such instruments and any agreed successors thereto with all applicable legal requirements of the federal Home Owners Loan Act and of states other than the state of Massachusetts, and TERI warrants their conformity with Massachusetts and federal laws other than the federal Home Owners Loan Act.

      b.    In addition, upon TERI's request, the LENDER will submit to TERI sample copies of promotional and marketing materials used in connection with the Program. No such request for promotional and marketing materials shall constitute or be construed as a representation or warranty by TERI that such materials comply with applicable law or with the LENDER's obligations under this Agreement, and no such request by TERI shall excuse the LENDER's performance of any of its obligations under this Agreement. Lender warrants that all promotional and marketing materials it uses in connection with the Program and its use thereof comply with all applicable federal and state laws and regulations.

3.3   The LENDER will pay a guaranty fee for each Loan (the "Guaranty Fee") as follows:

      a     At the time of each disbursement of the Loan, the LENDER will promptly remit to TERI [**] of the principal amount of the Loan disbursed (the "Initial Guaranty Fee").

      b.    At such times as are set forth in Schedule 3.3 attached hereto and incorporated herein by reference, such additional fees as are set forth in the fifth and sixth columns of Schedule 3.3 ("Subsequent Guaranty Fee").

            i.

If the terms of Schedule 3.3 call for any Guaranty Fees to be paid to TERI or to the Agent concurrent with the Securitization Transaction, the LENDER shall pay such fees directly (and be reimbursed in the Securitization Transaction to the extent provided in the Note Purchase Agreement).

ii. In the event that a Guaranty Claim is made with respect to a Loan before a Subsequent Guaranty Fee is scheduled to be paid by the LENDER for such Loan, the Subsequent Guaranty Fee shall become immediately due and payable.

iii. In the event that a loan is prepaid in full prior to the date that a Subsequent Guaranty Fee is scheduled to be paid by the LENDER for such Loan, the Subsequent Guaranty Fee shall nevertheless become due and payable at the time that would have applied if such prepayment had not occurred. For example, if a Subsequent Guaranty Fee is due at the time of a Securitization Transaction and a Loan is prepaid before it is eligible for Securitization, then the Subsequent Guaranty Fee with respect to such Loan shall become due at the first Securitization Transaction in which such Loan would have been eligible for inclusion, had prepayment not occurred.

iv. In the event that FMC fails to purchase any Loan under the Note Purchase Agreement, and the LENDER sells such Loan to a third party, the Guaranty Fees due with respect to such loan at the time of a Securitization Transaction will instead be paid by the LENDER at the time the loan is sold to the third party.

v. In the event FMC has no further right or obligation under the Note Purchase Agreement to purchase a Loan in a Securitization Transaction, the LENDER shall pay all Subsequent Guaranty Fees that are due to be paid at the time of securitization as set forth in Schedule 3.3. Such fees shall be payable (A) with respect to any Loan already funded, within thirty (30) days after presentation of an invoice by TERI to the Lender, and (B) with respect to Loans funded after the date of such invoice, at the time of disbursement.

vi. In the event that the LENDER fails to sell any Loan to FMC because the LENDER has breached the Note Purchase Agreement, the LENDER shall pay all Subsequent Guaranty Fees that are due to be paid at the time of securitization as set forth in Schedule 3.3. Such fees shall be payable directly to TERI and shall not be subject to the Deposit and Security Agreement.

c. Failure to remit any Guaranty Fee within thirty (30) days of the time set forth above will not affect the validity of the guaranty for any Loan for which the Guaranty Fee has already been paid in full, but, as a result, TERI will have the right, at its discretion to (i) void its obligation to guarantee or collect the Loan to which such Guaranty Fee relates or (ii) collect the amount of any such Guaranty Fee and to add interest at the rate of eighteen percent (18%) per annum from the disbursement date of the Loan to which such Guaranty Fee relates, plus any costs (including attorneys' fees and expenses) incurred by TERI in collecting or attempting to collect such Guaranty Fee from the LENDER.

d. Anything in the Program Guidelines to the contrary notwithstanding, if the LENDER is required under the terms of a Promissory Note to refund all or part of the Guaranty Fees identified above to a Borrower, TERI will refund all or part of the Guaranty Fee it has

received and the Agent will refund all or part of any Guaranty Fee it has received (in each case related to the refund to such Borrower) to the LENDER upon being so advised by the LENDER in writing.

3.4   If TERI shall have purchased a Loan pursuant to Section 2.1 above, the LENDER will promptly repurchase such Loan upon request from TERI if (i) TERI succeeds, after purchasing, in obtaining from the Borrower three full consecutive on-time monthly payments, according to any schedule permitted by the Program Guidelines, provided that on the date of TERI's notice to repurchase, the Borrower is within thirty (30) days of being current on his or her payments on such Loan, and provided further that this repurchase obligation may be invoked by TERI only once as to any Loan (in which case, the Loan shall be considered "rehabilitated"); or (ii) if TERI should determine that the Loan does not meet the conditions set forth in subsections b., c. and d. of Section 2.2 above. With respect to the repurchase of any Guaranteed Loan pursuant to this Section 3.4, the repurchase price shall be equal to (1) the remaining unpaid principal balance of such Loan, plus (2) any accrued and unpaid interest thereon.

3.5   To the extent permitted by applicable law, the LENDER will (i) deliver to TERI such reports, documents, and other information concerning the Loans as TERI may reasonably require, and (ii) permit independent auditors, authorized representatives of TERI and governmental agencies, if any, having regulatory authority over TERI, to have access to the operational and financial records and procedures directly applicable to Loans and to the LENDER's participation in the Program. LENDER will cause its loan servicer to deliver to TERI such reports, documents, and other detailed information concerning each Loan as TERI may reasonably require. LENDER shall provide a monthly report containing the information set forth on Exhibit B hereto at LENDER's expense TERI shall arrange directly with the loan servicer to receive the report. Any other reporting or information shall be provided upon TERI's agreement to reimburse LENDER for its incremental cost of such report.

3.6   If the LENDER should violate any term of this Agreement, it will be liable to TERI for all loss, cost, damage or expense sustained by TERI as a result. The LENDER will indemnify TERI and hold it harmless from and against all loss, cost, damage or expense that TERI may suffer as a result of claims to the extent they arise out of the LENDER's actions or omissions relative to the LENDER's participation in the Program unless such actions or omissions are specifically required by this Agreement, and do not arise out of TERI's actions or omissions. The LENDER will similarly indemnify TERI with respect to any defenses arising from the LENDER's violation of or failure to comply with any term of this Agreement, that may be raised by a Borrower to any suit upon a Promissory Note. "Expense" includes, without limitation, TERI's reasonable attorney's fees.

Section 4:    REPRESENTATIONS AND WARRANTIES

4.1   Each party represents and warrants to the other that its execution, delivery and performance of this Agreement are within its power and authority, have been authorized by proper proceedings, and do not and will not contravene any provision of law or such party's organizational documents or by-laws or contravene any provision of, or constitute an event of default or an event which, with the lapse of time or with the giving of notice or both, would constitute an event of default, under any other agreement, instrument or undertaking by which such party is bound. Each party represents and warrants that it has and will maintain in full force and effect all

Exhibit 1 - Page 35 of 53
Case 18-01042-j    Doc 35    Filed 08/26/19    Entered 08/26/19 18:53:44 Page 47 of 65
file:///C:/Users/ebearfield/AppData/Local/Microsoft/Windows/Temporary%20Internet%20...    8/14/2018

licenses required under applicable state, federal, local or other law for the conduct of all activities contemplated by this Agreement and comply with all requirements of such applicable law relative to its licenses and the conduct of all activities contemplated by this Agreement. This Agreement and all of its terms and provisions are and shall remain the legal and binding obligation of the parties, enforceable in accordance with its terms subject to bankruptcy and insolvency laws. The warranties given herein shall survive any termination of this Agreement.

4.2     The parties acknowledge that TERI is not an insurer or reinsurer and the LENDER expressly waives all claims it might otherwise have under applicable law were TERI to be held by any court or regulatory agency to be acting as an insurer or reinsurer hereunder. The only obligations of TERI to the LENDER shall be those expressly set forth herein.


Section 5:        MISCELLANEOUS

5.1     Neither party is or will hold itself out to be the agent, partner, or joint venturer of the other party with regard to any transaction under or pursuant to this Agreement.

5.2     Each party's respective rights, remedies, powers, privileges, and discretions ("Rights and Remedies") shall be cumulative and not exclusive. No delay or omission by either party in exercising or enforcing any of its Rights and Remedies shall operate as to constitute a waiver of them. No waiver by a party of any default under this Agreement shall operate as a waiver of any subsequent or other default under this Agreement. No single or partial exercise by a party of any of its Rights and Remedies shall preclude the other of further exercise of such Rights and Remedies. No waiver or modification by a party of the Rights and Remedies on any one occasion shall be deemed a continuing waiver. A party may exercise its various Rights and Remedies at such time or times and in such order of preference as it in its sole discretion may determine. In no event will either party be liable to the other for special, incidental, or consequential damages, including but not limited to lost profits, even if advised in advance of the possibility of the same, or for punitive or exemplary damages, provided that such exclusions shall not apply to the indemnification against an award of such damages pursuant to a third party claim.

5.3     This Agreement (including the Program Guidelines and all exhibits and schedules hereto), together with (i) the Deposit and Security Agreement and (ii) the Loan Origination Agreement, of even date herewith, between TERI and the LENDER ((i) and (ii) together, the "Ancillary Agreements"), represents the entire understanding of the parties with respect to the subject matter hereof. This Agreement, together with any contemporaneous contract concerning credit analysis and the Ancillary Agreements, supersedes all prior communications whatsoever between the parties relative in any way to Loans or the LENDER's participation in the Program. This Agreement may be modified only by written agreement of the parties hereto, except as may otherwise be set forth herein.

5.4     Any determination that any provision of this Agreement is invalid, illegal, or unenforceable in any respect shall not affect the validity, legality, or enforceability of such provision in any other instance and shall not affect the validity, legality, or enforceability of any other provision of this Agreement.

5.5

Each of the parties will timely implement, if it has not already, and will maintain, a reasonable disaster recovery plan. Subject to the foregoing, no party hereto shall be responsible for, or in breach of this Agreement if it is unable to perform as a result of delays or failures due to any cause beyond its control, howsoever arising, and not due to its own act or negligence and that cannot be overcome by the exercise of due diligence. Such causes shall include, but not be limited to, labor disturbances, riots, fires, earthquakes, floods, storms, lightning, epidemics, wars, hostilities, terrorist acts, civil disorder, expropriation or confiscation of property, failure or delay by carriers, interference by civil and military authorities whether by legal proceeding or in fact and whether purporting to act under some constitution, decree, law or otherwise, acts of God and perils of the sea.

5.6    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the conflict of laws provisions thereof.

5.7    This Agreement will be binding on the parties' respective successors and assigns. Except as otherwise set forth in this Section 5.7, this Agreement may not be assigned by either party without the other's written consent.

    a.    The LENDER may, without TERI's consent, assign any Loan, together with the provisions hereof as applicable to such Loan, to another entity participating in the Program, or to an SPE formed by the LENDER, in each case upon written notice to TERI.

    b.    TERI specifically acknowledges that FMC or an SPE sponsored by FMC is expected to purchase some or all of the Loans, and this Agreement shall inure to the benefit of FMC or any such SPE upon such purchase. No notice of such purchase or consent to the assignment of the LENDER's rights under this Agreement in connection with a purchase of some or all of the Loans by FMC or any SPE sponsored by FMC shall be necessary.

    c.    In assigning any Loan and its rights under this Agreement relating to such Loan in accordance with Section 5.7(a), (i) the LENDER's written notice to TERI must be made within thirty (30) days after said assignment and must identify each Loan to which such assignment relates, and (ii) TERI will fully cooperate with any Securitization Transaction or other sale of a portfolio of Loans, provided it is given thirty (30) days advance written notice of the date that information or documents are required of it and provided that its reasonable legal fees and other expenses incurred in connection with such transaction are reimbursed by the seller of such Loans.

    d.    Except for any assignment hereunder to FMC or any SPE sponsored by FMC in connection with a purchase of Loans as described in subsection b. above, no assignment of Loans or the LENDER's rights hereunder without TERI's express written consent shall release the LENDER from any liability to TERI under this Agreement arising out of the LENDER's ownership of such Loans (whether arising prior to, as a result of or after the sale of such Loans by the LENDER) including, without limitation, the LENDER's obligation to pay any unpaid Guaranty Fees and to repurchase Loans pursuant to Section 3.4.

    e.    The Lender acknowledges that TERI has outsourced or subcontracted some or all of its administrative functions, including but not limited to the processing of guarantee claims, to First Marblehead Education Resources, Inc. In addition, the Lender acknowledges that TERI has subcontracted and may hereafter subcontract any administrative obligations

Exhibit 1 - Page 37 of 53
Case 18-01042-j    Doc 35    Filed 08/26/19    Entered 08/26/19 18:53:44 Page 49 of 65
file:///C:/Users/ebearfield/AppData/Local/Microsoft/Windows/Temporary%20Internet%20...    8/14/2018

necessary or convenient to TERI to perform its obligations hereunder, and that such subcontracts do not and shall not require the consent of the LENDER. Such outsourcing or subcontracting shall not relieve TERI of its obligations under this Agreement.

5.8   Notice for any purpose hereunder may be given by any means requiring receipt signature, or by facsimile transmission confirmed by first class mail. In the case of TERI, notices should be sent to its President, and if by fax, to (781) 849-8433. In the case of the LENDER, notices should be sent to its President, with a copy to its General Counsel, and if by fax, to 215-682-1770. Either party may from time to time change the person, address or fax number for notice purposes by formal notice to the other party.


Section 6:       CHANGES TO PROGRAM GUIDELINES

The parties agree that the Program Guidelines will need to be updated and modified from time to time to respond to changed conditions. The parties intend to make such modifications in a manner that does not interfere with the ordinary advertising and origination cycle for education loans. Amendments necessary to meet state or federal regulatory requirements may be made at any time. With respect to all other changes, the parties shall exchange requests for modification of the Program Guidelines, including without limitation any requested changes to the provisions of the Program Guidelines concerning the Guaranty Fees, in the first part of the first calendar quarter of each year. Each party shall respond in writing to proposals from the other within thirty (30) days, and both parties will attempt to resolve any differences within thirty (30) days after receiving a response to a request. All modifications must be mutually acceptable. Any modifications approved by the parties and not requiring system adjustments by the LENDER's loan servicer shall take effect within thirty (30) days after approval. Modifications requiring system adjustments by the LENDER's loan servicer shall take effect as soon after approval as such servicer shall be able to adjust its systems to accept loans made on the modified terms, and the LENDER agrees to take such actions as are reasonably necessary to ensure that such servicer adjusts its systems as promptly as practicable. The parties shall use their best efforts to conclude all negotiations of proposed changes prior to May 1 of each year. The foregoing process shall not apply to modification of the Servicing Guidelines, which are subject to the modification process contained therein.

Section 7:       TERM AND TERMINATION

7.1   The initial term of this Agreement shall commence on the date first set forth above, and shall continue until [**]. Thereafter, this Agreement may be renewed by mutual agreement of the parties not less than [**] days prior to the end of the then-current term.

7.2   In the event that the parties are unable to agree on a proposed modification to the Program Guidelines as provided in Section 6, above, the party proposing the modification shall have the option of terminating this Agreement effective immediately upon written notice of termination to the other party, provided that the party desiring to exercise this option to terminate does so within [**] of the end of the [**] day period provided in Section 6 for the resolution of any differences. In the event of termination under this Section 7.2 and for no other reason, neither party shall be subject to any termination fees or penalties.

7.3   To the extent permitted by applicable law, if either party should become subject to bankruptcy, receivership, or other proceedings affecting the rights of its creditors generally, the party becoming subject to such proceedings will promptly notify the other party thereof, and this

Exhibit 1 - Page 38 of 53
Case 18-01042-j     Doc 35     Filed 08/26/19     Entered 08/26/19 18:53:44 Page 50 of 65
file:///C:/Users/ebearfield/AppData/Local/Microsoft/Windows/Temporary%20Internet%20...   8/14/2018

Agreement will be deemed terminated immediately upon the initiation of such proceedings without the need of notice to the other party.

7.4   Termination shall be prospective only and shall not affect the obligations of the parties hereto which were incurred prior to such termination or any of the warranties and indemnities contained herein or the provisions of Section 8 below (regarding confidentiality). Not less than [**] days prior to the effective date of termination, TERI may, by additional notice to the Lender, terminate its obligation to assume the guaranty of all or any subset of otherwise qualifying Loans for which applications were received after the date of Lender's receipt of such additional notice. In the absence of such additional notice TERI will, subject to the terms and conditions of this Agreement, assume the guaranty of all Loans as to which a commitment to lend is made prior to the effective date of termination. In the event this Agreement terminates or expires and only one disbursement of a multi-disbursement loan has been made prior to that date, the other disbursement will also be guaranteed pursuant to the terms of this Agreement.

7.5   Notwithstanding the foregoing, if the Lender is determined to be a "troubled" institution, as defined in 12 CFR, Section 563.555, the Office of Thrift Supervision may terminate this Agreement upon reasonable notice and without penalty.

Section 8:   CONFIDENTIALITY; RESTRICTIONS ON USE OF INFORMATION

8.1   During the course of negotiating this Agreement and hereafter during the pendency of this Agreement, the parties from time to time may have revealed or may hereafter reveal to each other certain information concerning their respective business plans, business methods, financial data and projections, and/or information that is not generally known in the student loan industry, including, without limitation, the terms and conditions of this Agreement. All the foregoing is referred to herein as "Confidential Information." In TERI's case, its Confidential Information also includes, but is not limited to, information concerning the operation of its telephone and on-line loan applications procedures, and its online credit scoring system. Each party will use reasonable efforts to preserve the confidentiality of Confidential Information contained herein or disclosed to it by the other party, such efforts to be not less vigilant than those that such party uses to protect its own proprietary information. The foregoing is subject to the following qualifications:

a.   No party will be so bound with respect to information that is or becomes public knowledge in the student loan industry (but if it does so through any fault of such party that fault will be considered a material breach of this Agreement);

b.   No party will be so bound with respect to information that is now or hereafter comes into its possession by its own documented independent efforts or from a third party who, so far as the recipient party has reason to believe, is under no comparable restriction with respect to such information;

c.   Either party may disclose Confidential Information to its attorneys, auditors, agents, and consultants who are bound to maintain the confidentiality of such information;

d.   Either party may disclose Confidential Information in the context of any regulatory review of its operations or as compelled by law, regulation, or court order, provided that in the

Exhibit 1 - Page 39 of 53
Case 18-01042-j    Doc 35    Filed 08/26/19    Entered 08/26/19 18:53:44 Page 51 of 65
file:///C:/Users/ebearfield/AppData/Local/Microsoft/Windows/Temporary%20Internet%20...    8/14/2018

context of a court order the party required to disclose will (i) give the other party prompt written notice upon learning of the requirement so that the other party may take appropriate action to prevent or limit the disclosure, (ii) consult with the other party and use all reasonable efforts to agree on the nature, form, timing and content of the disclosure, (iii) except as otherwise agreed under (ii), disclose no more than its counsel advises is legally required, and (iv) inform the Court and all counsel concerned that such information is and should be treated as confidential information of the other party; and

e.  Information concerning Loans and Borrowers that comes into TERI's possession shall not be considered Confidential Information of the Lender.

f.  Without limiting the foregoing, TERI may disclose any of the LENDER's Confidential Information to any entity to which TERI subcontracts its obligations under this Agreement pursuant to Section 5.7(e) hereof.

8.2  In accordance with the provisions of Title V of the Gramm-Leach-Bliley Act (the "GLB Act") and Federal Reserve Board Regulation P ("Regulation P"), TERI agrees, as a financial institution subject to Regulation P, to respect and protect the security and confidentiality of any "nonpublic personal information" (as defined in the GLB Act and Regulation P) relating to applicants for Loans and to Borrowers, including, where applicable, the restrictions on the re-use and disclosure of such information set forth in the GLB Act and Regulation P.

8.3  Without limiting the foregoing, TERI may retain as its own property and use for any lawful purpose any or all aggregated or de-identified data concerning Loan applicants and Borrowers, which does not include the name, address or social security number of the Loan applicants or Borrowers. TERI may sell, assign, transfer or disclose such information to third parties including, without limitation, FMC, who may also use such information for any lawful purpose.


        IN WITNESS WHEREOF, TERI and the LENDER have caused this Agreement to be executed by their duly authorized officers under seal as of the day and year indicated above.

THE EDUCATION RESOURCES                    GMAC Bank
INSTITUTE, INC.

By: /s/ Lawrence W. O'Toole                By: /s/ Michael P. DiComo
Print Name: Lawrence W. O'Toole            Print Name: Michael P. DiComo
Title: President                           Title: Senior Vice President


                          TABLE OF EXHIBITS

Exhibit A – Program Guidelines for GMAC Bank Student Loan Program

Exhibit B – Servicer Data Requirements

Schedule 3.3 – Guaranty Fee Amounts

                **Exhibit A – Program Guidelines for GMAC Bank Student Loan Program**

[**]

**EXHIBIT B**
**Servicer Data Requirements**

[**]

May 12, 2003

March 21, 2003
(Page 1 of 1)

**SCHEDULE 3.3 TO GUARANTY AGREEMENT BETWEEN TERI AND GMAC BANK**

[**]

```
BORROWER SSN: ***-**-8657  NAME: GOMEZ, MARIE J
1ST DISB: 08/02/05 LN SEQ: 0001  LN PGM: ALPLN      OWN: 122962PM-NCT
GUARANTOR: TERI                   CUST ACCT:  LT09 ORIG BAL:  29,591.40
BOND ISSUE: NCT20062  PD AHEAD:    STATUS: ACTIVE     CURR BAL:      0.00
```

|    | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|----|---------|----------------|-------------|-----------|-------------|------------------|-------------------|
| 1  |         | 01/04/12       | 01/04/12    | 5003A     | 15.00CR     | 0.00             | 0.00              |
| 2  |         | 01/03/12       | 01/03/12    | 1030A     | 32,336.31CR | 65.26            | 0.00              |
| 3  |         | 12/18/11       |             | 2601A     | 5.00        | 122.24           | 31,646.18         |
| 4  |         | 11/18/11       |             | 2601A     | 5.00        | 126.32           | 31,646.18         |
| 5  |         | 10/18/11       |             | 2601A     | 5.00        | 73.35            | 31,646.18         |
| 6  |         | 09/30/11       | 10/04/11    | 1010C     | 20.00CR     | 4.08             | 31,646.18         |
| 7  |         | 09/29/11       | 09/30/11    | 1010C     | 261.00CR    | 44.92            | 31,646.18         |
| 8  |         | 09/18/11       |             | 2601A     | 5.00        | 126.59           | 31,646.18         |
| 9  |         | 08/18/11       |             | 2601A     | 5.00        | 126.59           | 31,646.18         |
| 10 |         | 07/18/11       |             | 2601A     | 5.00        | 49.00            | 31,646.18         |

```
        SELECTION __


 F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

BORROWER SSN: ***-**-8657  NAME: GOMEZ, MARIE J
1ST DISB: 08/02/05 LN SEQ: 0001  LN PGM: ALPLN     OWN: 122962PM-NCT
GUARANTOR: TERI                  CUST ACCT:  LT09 ORIG BAL:  29,591.40
BOND ISSUE: NCT20062   PD AHEAD:    STATUS: ACTIVE     CURR BAL:     0.00

|    | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|----|---------|----------------|-------------|-----------|-------------|------------------|-------------------|
| 1  |         | 07/06/11       | 07/06/11    | 1010C     | 350.00CR    | 74.06            | 31,646.18         |
| 2  |         | 06/18/11       |             | 2601A     | 5.00        | 127.93           | 31,646.18         |
| 3  |         | 05/18/11       |             | 2601A     | 5.00        | 123.81           | 31,646.18         |
| 4  |         | 04/18/11       |             | 2601A     | 5.00        | 226.98           | 31,646.18         |
| 5  |         | 02/22/11       | 02/22/11    | 1010C     | 1,415.90CR  | 16.81            | 31,646.18         |
| 6  |         | 02/18/11       |             | 2601A     | 5.00        | 130.35           | 32,243.52         |
| 7  |         | 01/18/11       |             | 2601A     | 5.00        | 130.84           | 32,243.52         |
| 8  |         | 12/18/10       |             | 2601A     | 5.00        | 76.32            | 32,243.52         |
| 9  |         | 11/30/10       | 11/30/10    | 1010C     | 60.00CR     | 50.88            | 32,243.52         |
| 10 |         | 11/18/10       |             | 2601A     | 5.00        | 131.44           | 32,243.52         |

        SELECTION __


F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN

```
BORROWER SSN: ***-**-8657  NAME: GOMEZ, MARIE J
1ST DISB: 08/02/05 LN SEQ: 0001  LN PGM: ALPLN      OWN: 122962PM-NCT
GUARANTOR: TERI                   CUST ACCT:  LT09  ORIG BAL:  29,591.40
BOND ISSUE: NCT20062   PD AHEAD:     STATUS: ACTIVE      CURR BAL:      0.00
```

|   | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---------|----------------|-------------|-----------|-------------|------------------|-------------------|
| 1 |         | 10/18/10       |             | 2601A     | 5.00        | 12.72            | 32,243.52         |
| 2 |         | 10/15/10       | 10/15/10    | 1010C     | 300.00CR    | 114.37           | 32,243.52         |
| 3 |         | 09/18/10       |             | 2601A     | 5.00        | 258.11           | 32,243.52         |
| 4 |         | 07/19/10       | 07/19/10    | 1010C     | 25.00CR     | 134.66           | 32,243.52         |
| 5 |         | 06/17/10       | 06/17/10    | 1010C     | 25.00CR     | 142.06           | 32,243.52         |
| 6 |         | 05/14/10       | 05/14/10    | 1010C     | 72.97CR     | 54.35            | 32,243.52         |
| 7 |         | 05/01/10       | 05/01/10    | 7001A     | 0.00        | 8.35             | 32,262.14         |
| 8 |         | 04/29/10       | 04/30/10    | 1010C     | 200.00CR    | 175.80           | 32,253.79         |
| 9 |         | 03/18/10       | 03/19/10    | 1010C     | 300.00CR    | 71.76            | 32,277.99         |
| 10|         | 03/01/10       | 03/01/10    | 1010C     | 250.00CR    | 46.53            | 32,506.23         |

```
     SELECTION __


F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

BORROWER SSN: ***-**-8657  NAME: GOMEZ, MARIE J
1ST DISB: 08/02/05 LN SEQ: 0001  LN PGM: ALPLN     OWN: 122962PM-NCT
GUARANTOR: TERI                 CUST ACCT:  LT09 ORIG BAL:  29,591.40
BOND ISSUE: NCT20062  PD AHEAD:   STATUS: ACTIVE    CURR BAL:     0.00

|   | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|
| 1 | | 02/18/10 | | 2601A | 5.00 | 126.91 | 32,577.79 |
| 2 | | 01/19/10 | 01/19/10 | 1010C | 250.00CR | 166.17 | 32,577.79 |
| 3 | | 12/11/09 | 12/11/09 | 1010C | 143.78CR | 47.18 | 32,661.62 |
| 4 | | 11/30/09 | 11/30/09 | 1010C | 300.00CR | 0.00 | 32,758.22 |
| 5 | | 11/30/09 | 11/30/09 | 1010C | 150.00CR | 51.98 | 33,058.22 |
| 6 | | 11/18/09 | | 2601A | 5.00 | 69.31 | 33,081.93 |
| 7 | | 11/02/09 | 11/02/09 | 1010C | 250.00CR | 65.05 | 33,081.93 |
| 8 | | 10/18/09 | | 2601A | 5.00 | 145.00 | 33,116.88 |
| 9 | | 09/15/09 | 09/15/09 | 1010C | 250.00CR | 80.45 | 33,116.88 |
| 10 | | 08/28/09 | 08/31/09 | 1010C | 210.00CR | 44.69 | 33,227.69 |

SELECTION __

F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN

```
BORROWER SSN: ***-**-8657  NAME: GOMEZ, MARIE J
1ST DISB: 08/02/05 LN SEQ: 0001  LN PGM: ALPLN    OWN: 122962PM-NCT
GUARANTOR: TERI                 CUST ACCT:  LT09  ORIG BAL:  29,591.40
BOND ISSUE: NCT20062   PD AHEAD:    STATUS: ACTIVE    CURR BAL:    0.00
```

|   | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|
| 1 | | 08/18/09 | | 2601A | 5.00 | 219.05 | 33,227.69 |
| 2 | | 06/30/09 | 06/30/09 | 1010C | 396.73CR | 54.41 | 33,227.69 |
| 3 | | 06/18/09 | | 2601A | 5.00 | 90.69 | 33,437.09 |
| 4 | | 05/29/09 | 06/01/09 | 1010C | 200.00CR | 49.88 | 33,437.09 |
| 5 | | 05/18/09 | | 2601A | 5.00 | 95.22 | 33,437.09 |
| 6 | | 04/27/09 | 04/27/09 | 1010C | 225.00CR | 40.81 | 33,437.09 |
| 7 | | 04/18/09 | | 2601A | 5.00 | 137.27 | 33,437.09 |
| 8 | | 03/23/09 | 03/25/09 | 1010C | 215.00CR | 33.43 | 33,437.09 |
| 9 | | 03/18/09 | | 2601A | 5.00 | 147.12 | 33,437.09 |
| 10 | | 02/24/09 | 02/24/09 | 1010C | 200.00CR | 40.12 | 33,437.09 |

```
     SELECTION __


F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
BORROWER SSN: ***-**-8657  NAME: GOMEZ, MARIE J
1ST DISB: 08/02/05 LN SEQ: 0001  LN PGM: ALPLN      OWN: 122962PM-NCT
GUARANTOR: TERI                  CUST ACCT:  LT09 ORIG BAL:  29,591.40
BOND ISSUE: NCT20062  PD AHEAD:   STATUS: ACTIVE      CURR BAL:     0.00
```

| | REV | EFFECTIVE | POSTED | TRAN | TRAN | INTEREST | PRINCIPAL |
|---|---|---|---|---|---|---|---|
| | REA | DATE | DATE | TYPE | AMOUNT | ACCRUED | BALANCE |
| 1 | | 02/18/09 | | 2601A | 5.00 | 127.06 | 33,437.09 |
| 2 | | 01/30/09 | 01/30/09 | 1010C | 210.00CR | 80.24 | 33,437.09 |
| 3 | | 01/18/09 | | 2601A | 5.00 | 311.08 | 33,437.09 |
| 4 | | 12/01/08 | 12/01/08 | 7001A | 0.00 | 760.14 | 33,437.09 |
| 5 | | 07/28/08 | 07/28/08 | 1010C | 150.00CR | 171.83 | 31,262.56 |
| 6 | | 06/30/08 | 06/30/08 | 1010C | 257.54CR | 117.90 | 31,262.56 |
| 7 | | 06/13/08 | | 2601A | 5.00 | 215.01 | 31,262.56 |
| 8 | | 05/13/08 | 05/13/08 | 1010C | 355.04CR | 187.26 | 31,262.56 |
| 9 | | 04/16/08 | 04/17/08 | 1010C | 150.00CR | 20.80 | 31,262.56 |
| 10 | | 04/13/08 | | 2601A | 5.00 | 148.28 | 31,262.56 |

```
    SELECTION __


F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
BORROWER SSN: ***-**-8657  NAME: GOMEZ, MARIE J
1ST DISB: 08/02/05 LN SEQ: 0001  LN PGM: ALPLN     OWN: 122962PM-NCT
GUARANTOR: TERI                 CUST ACCT:  LT09  ORIG BAL:  29,591.40
BOND ISSUE: NCT20062   PD AHEAD:    STATUS: ACTIVE    CURR BAL:     0.00
```

|   | REV | EFFECTIVE | POSTED | TRAN | TRAN | INTEREST | PRINCIPAL |
|---|-----|-----------|--------|------|------|----------|-----------|
|   | REA | DATE | DATE | TYPE | AMOUNT | ACCRUED | BALANCE |
| 1 | | 03/24/08 | 03/24/08 | 1010C | 160.00CR | 73.18 | 31,262.56 |
| 2 | | 03/15/08 | | 2601A | 5.00 | 187.02 | 31,262.56 |
| 3 | | 02/21/08 | 02/21/08 | 1010C | 153.16CR | 65.05 | 31,262.56 |
| 4 | | 02/13/08 | | 2601A | 5.00 | 227.68 | 31,262.56 |
| 5 | | 01/16/08 | 01/16/08 | 1010C | 153.16CR | 24.39 | 31,262.56 |
| 6 | | 01/13/08 | | 2601A | 5.00 | 225.67 | 31,262.56 |
| 7 | | 12/17/07 | 12/18/07 | 1010C | 153.16CR | 25.61 | 31,262.56 |
| 8 | | 12/14/07 | | 2601A | 5.00 | 153.70 | 31,262.56 |
| 9 | | 11/26/07 | 11/26/07 | 1010C | 153.16CR | 111.01 | 31,262.56 |
| 10 | | 11/13/07 | | 2601A | 5.00 | 247.64 | 31,262.56 |

```
     SELECTION __


F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
BORROWER SSN: ***-**-8657  NAME: GOMEZ, MARIE J
1ST DISB: 08/02/05 LN SEQ: 0001  LN PGM: ALPLN     OWN: 122962PM-NCT
GUARANTOR: TERI                  CUST ACCT:  LT09 ORIG BAL:  29,591.40
BOND ISSUE: NCT20062  PD AHEAD:   STATUS: ACTIVE    CURR BAL:     0.00
```

|  | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|
| 1 | | 10/15/07 | 10/15/07 | 1010C | 153.16CR | 8.53 | 31,262.56 |
| 2 | | 10/14/07 | | 2601A | 5.00 | 405.39 | 31,262.56 |
| 3 | | 08/27/07 | 08/27/07 | 1010C | 153.16CR | 201.86 | 31,262.56 |
| 4 | | 08/03/07 | 08/03/07 | 1010C | 152.32CR | 294.38 | 31,262.56 |
| 5 | | 06/29/07 | 06/29/07 | 1010C | 154.00CR | 33.64 | 31,262.56 |
| 6 | | 06/25/07 | 06/25/07 | 1010C | 148.16CR | 100.93 | 31,262.56 |
| 7 | | 06/13/07 | | 2601A | 5.00 | 176.62 | 31,262.56 |
| 8 | | 05/23/07 | 05/24/07 | 1010C | 158.16CR | 75.69 | 31,262.56 |
| 9 | | 05/14/07 | | 2601A | 5.00 | 260.73 | 31,262.56 |
| 10 | | 04/13/07 | 04/13/07 | 1010C | 153.16CR | 361.93 | 31,262.56 |

```
      SELECTION __


F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
BORROWER SSN: ***-**-8657  NAME: GOMEZ, MARIE J
1ST DISB: 08/02/05 LN SEQ: 0001  LN PGM: ALPLN      OWN: 122962PM-NCT
GUARANTOR: TERI                CUST ACCT:  LT09  ORIG BAL:  29,591.40
BOND ISSUE: NCT20062  PD AHEAD:   STATUS: ACTIVE      CURR BAL:      0.00
```

|   | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---------|----------------|-------------|-----------|-------------|------------------|-------------------|
| 1 | | 03/01/07 | 03/01/07 | 7001A | 0.00 | 108.28 | 31,262.56 |
| 2 | | 02/16/07 | 02/16/07 | 1010C | 300.00CR | 24.98 | 30,928.78 |
| 3 | | 02/13/07 | | 2601A | 5.00 | 183.25 | 30,928.78 |
| 4 | | 01/22/07 | 01/22/07 | 1010C | 250.00CR | 49.97 | 30,928.78 |
| 5 | | 01/16/07 | 01/17/07 | 1010C | 60.00CR | 24.98 | 30,928.78 |
| 6 | | 01/13/07 | | 2601A | 5.00 | 542.32 | 30,928.78 |
| 7 | | 11/09/06 | 11/13/06 | 7001A | 0.00 | 1,175.69 | 30,928.78 |
| 8 | | 06/08/06 | 06/08/06 | 0390A | 29,753.09 | 0.00 | 29,293.71 |
| 9 | | 06/08/06 | 06/08/06 | 0395A | 29,753.09CR | 405.84 | 0.00 |
| 10 | | 04/13/06 | 04/14/06 | 1010C | 240.00CR | 293.54 | 29,293.71 |

```
        SELECTION __


F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
BORROWER SSN: ***-**-8657  NAME: GOMEZ, MARIE J
1ST DISB: 08/02/05 LN SEQ: 0001  LN PGM: ALPLN      OWN: 122962PM-NCT
GUARANTOR: TERI                  CUST ACCT:  LT09  ORIG BAL:  29,591.40
BOND ISSUE: NCT20062   PD AHEAD:    STATUS: ACTIVE     CURR BAL:     0.00
```

|    | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|----|---------|----------------|-------------|-----------|-------------|------------------|-------------------|
| 1  |         | 03/02/06       | 03/02/06    | 1010C     | 240.00CR    | 138.19           | 29,293.71         |
| 2  |         | 02/10/06       | 02/10/06    | 1010C     | 238.93CR    | 207.33           | 29,395.52         |
| 3  |         | 01/11/06       | 01/12/06    | 1010C     | 236.79CR    | 262.91           | 29,401.00         |
| 4  |         | 12/02/05       | 12/02/05    | 1010C     | 240.00CR    | 194.10           | 29,401.00         |
| 5  |         | 11/02/05       | 11/02/05    | 1010C     | 240.00CR    | 194.40           | 29,446.90         |
| 6  |         | 10/03/05       | 10/04/05    | 1010C     | 238.93CR    | 189.72           | 29,492.50         |
| 7  |         | 09/02/05       | 09/02/05    | 1010C     | 238.93CR    | 189.24           | 29,541.71         |
| 8  |         | 08/02/05       | 08/02/05    | 0101A     | 29,591.40   | 0.00             | 29,591.40         |
| 9  |         |                |             |           |             |                  |                   |
| 10 |         |                |             |           |             |                  |                   |

```
     SELECTION __


F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
  BORROWER SSN ***-**-8657   NAME MARIE J GOMEZ


          SCHED   INSTALL  REPAY  REPAY  1ST DUE 1ST DISB   LOAN
  SEL STA TYPE    AMOUNT   LVLS   TERM    DATE    DATE      PGM       OWNER
   1  I   L       260.86     2     169   08/02/11 08/02/05 ALPLN      NCT
   2  I   L       253.70     2     180   09/02/10 08/02/05 ALPLN      NCT
   3  I   RP       25.00     3     183   06/02/10 08/02/05 ALPLN      NCT
   4  I   L       247.97     2     188   01/02/10 08/02/05 ALPLN      NCT
   5  I   TG      298.06     3     199   02/02/09 08/02/05 ALPLN      NCT
   6  I   TG      197.93     3     200   01/02/09 08/02/05 ALPLN      NCT
   7  I   TG      252.77     4     210   02/28/08 08/02/05 ALPLN      NCT
   8  I   TG      153.16     4     222   03/28/07 08/02/05 ALPLN      NCT
   9  I   L       303.80     2     224   12/28/06 08/02/05 ALPLN      NCT
  10  I   L       238.93     1     240   09/02/05 08/02/05 ALPLN      NCT
   0  ********************************************************************
   0  ********************************************************************


     SELECTION  __



  F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

# VERIFICATION OF ANSWERS TO INTERROGATORIES

COUNTY OF GWINNETT :
: SS
STATE OF GEORGIA :

I, Bradley Luke, Director of Operations for Transworld Systems Inc., subservicer for Defendant, being first duly cautioned and sworn, according to law, depose and state that I have read and understand the foregoing Interrogatories, and that the answers to those Interrogatories and the facts stated therein are true to the best of my knowledge and belief.

Bradley Luke

Sworn to and subscribed before me in my presence this ___8___ day of
_February___, 2019.

Notary Public

